HELLBUSCH, *Respondent,*
*v.*
RHEINHOLDT et ux, *Appellants.*

550 P2d 1199

*Neil R. Bryant,* Bend, argued the cause for appellants. With him on the brief were William M. Holmes, and Gray, Fancher, Holmes & Hurley, Bend.

*Max Merrill* of Merrill & O'Sullivan, Bend, argued the cause and filed a brief for respondent.

Before O'Connell,* Chief Justice, and McAllister, Denecke,** Tongue, and Bryson, Justices.

BRYSON, J.

---

*Chief Justice when the case was argued.
**Chief Justice when the case was decided.

## BRYSON, J.

Plaintiff brought this suit to foreclose a mechanic's lien on defendants' dwelling for the balance due on the construction contract. Defendants appeal from a decree in favor of plaintiff. We review de novo.

In November, 1972, defendants contacted plaintiff regarding the construction of a home for them in Bend, Oregon. They had no plans or specifications. By March of 1973 defendants had a designer prepare the plans and elevation drawings but no specifications. In the latter part of May, 1973, defendants asked plaintiff "to get started on the foundation on a cost plus basis." Defendants did not submit specifications for materials or fixtures and plaintiff could not submit a firm price. The parties did not execute a written contract, and none was prepared.

Plaintiff claims there was an oral contract to build on "cost plus." Defendants claim there was an oral contract to build for a fixed price of $49,798.45. This price is based on plaintiff's "Contractor's Estimate Sheet" submitted to defendants so they could apply for a construction loan. Subsequently, plaintiff, at defendants' request, prepared a form, "Description of Materials." The estimate is itemized in a scanty manner on a printed form and obviously does not include all building items contemplated by the parties, and particularly defendants.

The Contractor's Estimate Sheet, on which defendants claim a fixed contract price for construction, concludes as follows:

"TOTAL COST            $49798.45
    PROFIT            ‾‾‾‾‾‾‾
    COMPLETE BID       ‾‾‾‾‾‾‾"

Neither the Contractor's Estimate Sheet nor the description of materials form is signed by the parties.

Plaintiff testified:

"A * * * We really never came to a full itemized spec list, specification sheet [description of materials].

"* * * * *.

"A * * * But he didn't have it spec'd out. He didn't have fixture numbers, he didn't have carpet, he didn't have all these items that I would need to know, what type of finished lumber goes into it, all these things that are hard to—hard to bid a house unless you have them.

"And since I did not have those, I continually — when he would bring me a new item that he wanted to add or a change in the house, and we work out a—an approximate cost of what this would be in addition to what we had originally been working with. And over a period of this two or three months, we—we just kept— the house kept growing. And I never did come to a final figure."

As the house was built, defendants continued to make numerous minor and major changes. The defendants didn't have the funds to pay plaintiff's final billing and the lien was filed, based on an oral contract to build on a cost-plus basis, showing:

"Labor and Materials in
| | | |
|---|---|---|
| construction of home | $60686.85 | |
| Less payments made | | 42789.57 |
| Costs: Preparation of Lien Notice | 5.00 | |
| Balance Due Claimant: | 17902.28" | |

This suit to foreclose followed.

The defendants contend the court erred "in formulating a cost plus contract between the parties." The court's letter opinion found:

"The principle [sic] bone of contention is whether this was a 'cost plus' contract or a contract for a firm price of $50,000. The evidence satisfies the court that the parties contracted for construction on a 'cost plus' basis. All the circumstances of their dealings are completely inconsistent with a firm price contract—e.g. lack of a written contract, no provision for change orders, defendant's free access to plaintiff's sub-contractors and defendant's incursions into the day-to-day decisions of construction.

Further, defendant's own admissions establish his understanding of the nature of the contract as being one of 'cost plus.'

"Although the parties did, in my view have a meeting of the minds as to the nature of the contract, they did leave an ambiguity by stating 'cost plus' without further definition. * * * Although there was some discrepancy in the witnesses testimony as to what percentage 'plus' was, in addition to cost, all the witnesses agreed inferentially, the percentage would be at least five percent—the approximate amount added to cost by the plaintiff."

The plaintiff testified that his original understanding of the contract was cost plus 10 percent, which would have amounted to approximately $6,000. However, before the filing of the lien he reduced his claim to cost plus 5 percent, or a profit of $3,000, in order to reach a settlement with the defendants, when defendants' loan would not cover the total construction cost of the dwelling as completed. Plaintiff testified:

"A And I chose at the final moments to get the thing settled up to drop my thing [cost-plus percentage] to $3,000."

The ambiguity in the oral contract was the amount of percentage to be applied as "cost plus" in arriving at plaintiff's profit. Certainly the parties did not contemplate that plaintiff would build the house for defendants at no profit. The evidence shows the defendants asked plaintiff to excavate and construct the foundation at "cost plus." Mr. Betts, a subcontractor, and Mr. Kearns, who inspected the house, both testified that Mr. Rheinholdt told them that plaintiff was building the house for him on a cost plus basis. Defendants argue that the percentage of profit to be applied cannot be determined by custom and usage.

"Usage may be important in three different aspects:

"(1) To aid in the interpretation of the meaning of the express language of an agreement, or the meaning of the parties' other manifestations of intention;

"(2) To annex terms to the agreement in accordance with the usage, provided they are consistent with the

express language or other manifestations of intention, though they may contradict or vary implications which otherwise would be drawn from the written or oral expression of the parties. * * *

"(3) To make inapplicable to an agreement rules of law otherwise applicable." 5 Williston, Law of Contracts 1-4, § 648 (Jaeger 3d ed 1961). (Footnotes omitted.)

"The terms 'usage' and 'custom' are commonly used interchangeably, though there is a recognized distinction in the meaning of the two words. Usage is a fact and not opinion or rule of law. It may be defined as habitual or customary practice among a certain class of people, or in a trade, a neighborhood or a large geographical area. Thus, the courts have said that when a usage 'has become uniform in an actively commercial community, that should be warrant enough for supposing that it answers the needs of those who are dealing upon the faith of it. I cannot see why judges should not hold men to understandings which are the tacit presupposition on which they deal.'

"Custom is such a usage as has by long and uniform practice become the law of the matter to which it relates: 'A custom has the force of law, and furnishes a standard for the measurement of many of the rights and acts of men. It must be certain, or the measurements by this standard will be unequal or unjust. It must be uniform; for, if it vary, it furnishes no rule by which to mete. It must be known, or must be so uniform and notorious that no person of ordinary intelligence who has to do with the subject to which it relates, and who exercises reasonable care, would be ignorant of it; * * *.' " 5 Williston, Law of Contracts 7-11, § 649 (Jaeger 3d ed 1961). (Footnotes omitted.)

*See Green Mt. Log Co. v. C. & N. R. R. R.,* 146 Or 461, 471, 30 P2d 1047, 86 ALR 1228 (1934); ORS 41.270. The question of determining the custom or usage is for the trier of facts. *Andrews Equip. Service v. Heintz Constr.,* 241 Or 28, 29, 403 P2d 774 (1965).

■ Defendant Marvin Rheinholdt is in the electrical and television business. Rheinholdt first met plaintiff when Rheinholdt was making installations at the Inn

of the Seventh Mountain near Bend, Oregon. Plaintiff was completing some construction work on the same project. Rheinholdt testified that he had dealt with suppliers and materialmen. On cross-examination he testified that he had never heard of the term "cost plus." The trial court did not accept this testimony and in light of all of the testimony, we reach the same conclusion. From the testimony, it is clear that defendants had reason to know of the custom in the industry and that a builder would charge at least 5 percent profit, based on his costs of construction.

Defendants also contend that plaintiff was not registered with the "Builder's Board" pursuant to Chapter 701, ORS, and, therefore, the court erred in allowing this foreclosure. ORS 701.065(1) provides:

"(1) A builder may not file a lien or bring or maintain in any court of this state a suit or action for compensation for the performance of any work or for the breach of any contract which is subject to this chapter, unless he was registered under this chapter at the time he filed the lien or commenced the suit or action.

"* * * * *."

■ The evidence shows that plaintiff was registered with the Builder's Board as Hellbusch Construction Co. The court allowed plaintiff's registration card, which showed his registration number as a "Homebuilder," to be received in evidence. Plaintiff did business as an individual under the name Hellbusch Construction Co. The purpose of Chapter 701, ORS, is to protect the party for whom the construction work is performed. It requires a surety bond to be posted and a procedure of filing complaints, claims, the investigation of complaints, and the satisfying of claims from the bond. There is no provision that requires a builder such as plaintiff to register both in his individual name and the name under which he does business, and we can see no practical reason for so providing. We conclude that the evidence was properly received, showing that the plaintiff was registered as

required by law. Further, the defendants did not raise this issue by any pleadings.

■ Finally, the defendants contend that "[t]he evidence does not support the finding that the plaintiff is entitled to a judgment in the sum of $14,851.13."

The defendants filed a list of complaints with the Builder's Board and one of their inspectors made an investigation and reco.nmendation. Most of the numerous complaints were minor in nature. There is testimony that there is a "hump" in the floor of the master bathroom; that the wrong tile was used in one of the bathrooms; that one of the three fireplaces was to be white brick rather than "painted white"; and that a "heatalator" was to have been installed in one of the fireplaces.

As to the "hump," the plaintiff testified:

"A   I can't do anything about that. I have worked on that. And when you're talking about a hump, it's not what I'd normally call a hump. Because lumber is not perfect. And it's not because the post is too high or anything like that, because I went down under that house, took out the post. It's — it has to be a flaw in the lumber. And you're only talking an eighth to a quarter of an inch at the very most. * * *"

We have examined all of the testimony and the trouble with placing the responsibility on the plaintiff arises from the fact that the defendants dealt individually with several of the subcontractors who performed the tile, brick, and fireplace work. It is difficult to determine whose fault, if any, resulted in the complaints submitted by the defendants. The testimony shows that plaintiff and his subcontractors performed their work in a good, workmanlike manner. Witnesses who inspected the premises for the Builder's Board estimated it would take one to three days' work to complete most of the objectionable items. The record discloses that the plaintiff agreed to make any reasonable correction. The trial judge did not allow the full

amount of the lien and made an additional allowance of $205 to cover the correction of specific items.

From our review of the evidence we reach the same conclusion as the trial judge, and the plaintiff is entitled to judgment in the amount of $14,851.13.

Affirmed.