Argued and submitted September 20, affirmed December 22, 1982, reconsideration denied February 4, petition for review denied March 29, 1983 (294 Or 682)

BROWN,
*Respondent,*
*v.*
D2S RESOURCES, INC.,
*Appellant,*

(No. A7911-05264, CA A22645)

656 P2d 946

Barry L. Adamson, Portland, argued the cause for appellant. With him on the briefs was Williams, Stark, Hiefield and Norville, P.C., Portland.

Derryck H. Dittman, Tigard, argued the cause for respondent. With him on the brief was Anderson, Dittman & Anderson, Tigard.

Before Richardson, Presiding Judge, Joseph, Chief Judge, and Van Hoomissen, Judge.

JOSEPH, C. J.

## JOSEPH, C. J.

Brown sought to foreclose a construction lien on property owned by D2S Resources, Inc., (D2S) for the reasonable value of labor and material used in partially performing agreements to make certain improvements in a subdivision under development by D2S.[1] D2S asserted several affirmative defenses and counterclaimed for damages for the cost of repairing Brown's allegedly defective work. The trial court dismissed the counterclaims, entered judgment for Brown and ordered the lien foreclosed. D2S appeals.

In March, 1979, Brown contracted with D2S to install sanitary and storm sewers and a water system in a new residential subdivision in Gresham. The contract price for the installation of the sanitary sewer system was $38,905.50, for the installation of the storm sewer, $21,933, and for the water system improvements, $12,639.50. While that work was underway, Brown agreed to construct streets in the subdivision for $59,406.60. Payment under each contract was to be for "Monthly progress by the tenth of the month progressive." All work was to be done in accordance with D2S' plans and specifications and was to have the approval of the city and the local water district.

Brown began work on March 3, 1979. On March 23, 1979, he billed D2S for:

| "Sanitary sewer | 90% complete | $35,014.95 |
| Storm sewer | 50% complete | 10,966.50 |
| | | $45,981.45" |

That bill was paid in full in April, 1979. Before completion of the sewer and water systems, Brown began back-filling the excavations for the project. The reason for doing that was disputed at trial. Brown testified that he covered the work at the request of D2S' president, who had told him that the company did not have the money to pay Brown for the work that he had done and that having the project in a

---

[1] The trial court dismissed the city of Gresham as a party. The Oregon Bank, as mortgagee of the property, was named as a defendant, and Brown sought to have his lien declared to be prior to that of the bank. The trial court declared Brown's lien to be a first lien.

"good-looking position" would facilitate further financing. At trial, D2S' president did not recall making the request.

On June 22, 1979, Brown billed D2S again:

| "Street const. | Item # 6 | 90% complete | $ 7,200.00 |
|---|---|---|---|
| "      " | "    # 1 | 150 yards | 1,575.00 |
| Water system | | 80% complete | 10,111.50 |
| Storm sewer system | | 95% complete | 20,836.35 |
| Sanitary sewer | | 95% complete | 36,905.50 |
| Temporary road rock * * * | | | 9,375.00 |
| | | | $86,003.35 |
| Less [previously paid invoice] | | | 45,981.45 |
| | | | $40,021.90" |

Brown testified that he did not return to work on the project after June 22, 1979, because he had not been paid for the work that he had done. He filed a lien in July, 1979, and an amended lien in August, 1979, giving D2S credit for a $5,000 payment made in July. He began suit to foreclose the lien on November 2, 1979.

In September, 1979, D2S decided to complete the project itself. It discovered that much of the work it had assumed that Brown had done on the sewer and water lines had not in fact been done. D2S met with Brown in December, 1979, and he then agreed to complete the sanitary sewer system for $2,000 and to complete a manhole for $700. He also agreed to give D2S a $5,000 "credit" because of the installation of two sewer lines at an improper grade.

Brown started to correct the grade defects and to complete the sewers in January, 1980, but quit because of bad weather.[2] D2S completed the project that winter, despite increased costs due to wet weather, because "[i]t was definitely cheaper to finish the job at that time than to wait until the summertime and waste 12 or $15,000 of interest." Costs to complete were also increased, because D2S had to re-excavate to locate the areas where the work was incomplete. D2S, however, did not first attempt to ascertain from Brown what work needed to be done. In March, 1980, D2S paid Brown $1,200 from the proceeds of a lot sale.

---

[2] Brown testified that he corrected the defective sewer lines that were the basis of the $5,000 "credit." D2S claims that that work was not completed.

On April 29, 1980, Brown filed an amended complaint for $28,821.90, alleged to be the reasonable value of labor and materials used in the sewer and water projects. That amount did not include the $5,000 "credited" to D2S. D2S' affirmative defenses alleged that Brown had breached the contracts by failing to complete the projects in accordance with the plans and specifications or in a workmanlike manner. The counterclaims for damages for the cost of repairing the work improperly done totalled $56,531.91. The trial court dismissed the counterclaims, awarded Brown a $26,719.83 judgment and decreed foreclosure of the lien.

■ ■  In its first assignment of error, D2S argues that the trial court erred in granting judgment in Brown's favor, because the evidence was legally insufficient to support the judgment. It claims, in essence, that there was no proof as to the reasonableness of the charges for labor and material used by Brown. However, D2S did not raise that issue at trial. If a party in a civil case, whether in law or equity, has not asserted the legal insufficiency of the evidence in the trial court, he may not do so on appeal. *Falk v. Amsberry,* 290 Or 839, 626 P2d 362 (1981); *Baldwin v. Miller,* 44 Or App 371, 606 P2d 629, *rev den* 289 Or 45 (1980); *but see* ORS 19.125(3).

■ ■  In its second assignment, D2S argues that the trial court erred in "failing to find that Brown had breached his agreements and in not granting judgment in favor of D2S on its counterclaim." However, D2S' position at trial was that there was no issue of breach of contract on Brown's part for having left the project and that the decisive issue was whether Brown's work was defective. Moreover, even if Brown had breached, that would not preclude recovery in *quantum meruit.* A breaching party may recover the reasonable value of his work to the extent that it has benefited the non-breaching party, who may of course counterclaim for any damages suffered as a result of the breach. *Welch v. Webb,* 47 Or App 771, 615 P2d 391 (1980). The basic issue is whether D2S is entitled to damages for the cost of repair. The counterclaims for damages are actions at law, and we review them accordingly. *McClory v. Gay,* 45 Or App 561, 608 P2d 1213 (1980); ORS 87.070(2); ORCP 2.

■ ■     Neither party disputes the fact that Brown's work did not conform to the plans and specifications insofar as certain things were not done that were shown on the plans to be done. Several lines, manholes and "T" joints were not installed, lines were not grouted and channeled, several sewer lines did not meet catch-basins and some manholes were not adjusted to the proper height. The nature of the work done by D2S after Brown had left the project, however, was disputed. D2S argues that, because the uncompleted work was covered over by Brown so that it appeared to be complete, the work that was not done was improperly done and in need of "repair." Brown testified, in essence, that correction of the deficiencies was work that he would have done in due course in order to complete the project. The resolution of that dispute required a factual determination, and the trial judge was entitled to assess the weight and credibility of the evidence. Although he made no formal findings of fact, it is clear from his comments at trial that he found that the project was back-filled at D2S' request and that D2S' claimed repair costs were really for re-excavation and completion of the project, not for repair work.

In colloquy with D2S' attorney at the end of the trial, the judge said:

"What I was getting to is that as I see it, the facts would be that the filling in, as you put it, was, as related by [Brown], at the request of your client. I would feel that the evidence shows that [D2S] knew very well that the job had to be completed.

"You say it doesn't make any difference, but it does make some difference if you are going to try to assert a counterclaim, particularly where you are trying to — in other words, take your example of the circuit here. If I haven't put in a control box so that you can turn it on, that is part of the plans, and you come along after the contractor has left, you own the building, and you say that is not according to the plans and specifications; I have to put that box in. And you know he left because he was not being paid and you make no challenge but that he had a right to leave the job, can you then — you then can't certainly charge him with the cost of installing that box. That just seems to me as clear as night and day. That is what I'm

getting at when I pressed you on the matter, is that that is what it seems to me you cannot do."

As support for its claim that it may recover the cost of completing the project under its allegations of repair work, D2S cites cases involving breach of contract claims. The fact that a non-breaching owner may recover the cost of completion or repairs from a breaching contractor does not mean that completing a project and repairing defective work are equivalent or that the owner may recover the cost of completion when there is no claim at trial that the contractor breached the contract by failing to complete the project. The trial court did not err.[3]

■ D2S asserts that the trial court erred in denying its motion to strike Brown's testimony that it is "a common practice" to install "T" joints in the sewer and water lines after the main lines are installed and to adjust manhole heights when the project is nearing completion. Brown testified that he did not install the joints as the lines were being built, because it was his custom and "a common practice in storm sewer construction" to return later to the location of each "T" joint and "break into" the line in order to install a fabricated "T" joint. He also stated that "other contractors do the same thing."

D2S argues that Brown's testimony violates ORS 41.270, which states:

"Usage shall be proved by the testimony of at least two witnesses."[4]

---

[3] While Brown was working on the project in May, he broke an existing sewer line that ran directly through the subdivision. The plans did not show the existence of this line, and the contracts made no mention of it. Brown hooked it up to the yet uncompleted sewer system on the assumption that the system would be completed that summer. No one objected to the hookup at that time. D2S' construction superintendent testified that "the city was looking the other way all this time." After Brown had left the project in the following winter, the Gresham inspector required D2S to re-route the line completely around the project to a pre-existing manhole, because the new system was not yet completed or approved. (Apparently, the line was broken a second time, but Brown denied any knowledge of that.) The re-routing was included in D2S' claim for repair work. It is not at all clear that re-routing the line around the perimeter of the subdivision was Brown's responsibility or that it was "repair work." That is, had the city decided not to "look the other way" when the line was broken and then hooked up to the new sewer line, it is not clear that the re-routing around the project would have been Brown's responsibility.

[4] The 1981 legislature added a provision to ORS 41.270 that reads:

D2S claims that Brown's testimony about "usage" was offered to prove a modification of the sewer contract and of Gresham's standards incorporated in it. However, there was no evidence that the contract or the standards prohibited the procedures used by Brown. The Gresham inspector testified that "normally" "T" joints are placed in the main line as it is being constructed. D2s' construction superintendent testified that "T" joints are required, because the Gresham standards do not allow lines to be grouted directly into the main line. Moreover, the facts that D2S broke into the main line to install the "T" joints and that the completed sewer system met Gresham's approval suggests that the contract and the standards did not prohibit Brown's allegedly temporary procedure.

D2S claims that Brown's testimony about "usage" was offered to excuse his non-performance. Its argument seems to be that Brown's failure to install the "T's" at the time the lines were constructed or to adjust the manholes to the proper height as they were installed is evidence that the work was improperly, rather than incompletely, done and that installation of the "T's" and the adjustment of the manholes were repair work. Brown's testimony was an attempt to rebut the contention that he never intended to install the "T's" or adjust the manholes. The testimony that "other contractors do the same thing" was to the effect that the work was incomplete rather than improperly done. It was not an attempt to establish "usage" as that word is used in ORS 41.270. *See Hellbusch v. Rheinholdt,* 275 Or 307, 550 P2d 1199 (1976); *Rhodes v. Moore,* 239 Or 454, 398 P2d 189 (1965); *Silver Falls Co. v. E & W Lbr. Co.,* 149 Or 126, 40 P2d 703 (1935).

Affirmed.

---

"(2) Evidence may be given of usage to explain the true character of an act, contract or instrument when such true character is not otherwise plain, but usage is never admissible except as a means of interpretation."

The language quoted in the text was retained. The statute as amended was not in effect at the time of trial.