Argued and submitted September 1, 1994, accused suspended from the practice of
law for 63 days March 30, 1995

# In re Complaint as to the Conduct of
# CHARLES O. PORTER,
*Accused.*
# (OSB 92-118; SC S41229)

890 P2d 1377

John Glenn White, Eugene, argued the cause for the accused. Charles O. Porter filed the brief *pro se*. With him on the reply brief was John Glenn White.

Jeffrey D. Sapiro, Disciplinary Counsel, argued the cause and filed the response for the Oregon State Bar.

PER CURIAM

Fadeley, J., concurred and filed an opinion.

## PER CURIAM

In this lawyer disciplinary proceeding, the accused is charged with violating Disciplinary Rules (DR) 1-102(A)(3) (conduct involving dishonesty)[1] and 7-106(C)(5) (failure to comply with known local customs of courtesy)[2] of the Code of Professional Responsibility. A trial panel of the disciplinary board found the accused guilty on both counts and suspended him from the practice of law for 30 days. The accused requested direct review by this court. Bar Rules of Procedure (BR) 10.3. On *de novo* review, ORS 9.536(3), we find the accused guilty of the DR 1-102(A)(3) charge and suspend him for 63 days.

The charges against the accused stem from an exchange of letters between the accused and lawyer Bodyfelt. The letters concerned the possible entry of a default by the accused against Bodyfelt's client, without prior notice to Bodyfelt, in federal district court. The Bar's complaint alleges that (1) in a letter to Bodyfelt, the accused represented that he would not seek a default against Bodyfelt's client without prior notice and (2) the accused thereafter applied for and obtained a default against Bodyfelt's client without giving Bodyfelt the prior notice that the Bar alleges is required by custom among federal court practitioners in Eugene.

### DR 1-102(A)(3)

We begin our discussion with the charges of dishonesty and misrepresentation under DR 1-102(A)(3). After careful review of the record, we make the following findings of fact. In 1991, the accused represented the Nolans, a husband

---

[1] DR 1-102(A)(3) provides:

"It is professional misconduct for a lawyer to:

"* * * * *

"(3) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

[2] DR 7-106(C)(5) provides:

"In appearing in the lawyer's professional capacity before a tribunal, a lawyer shall not:

"* * * * *

"(5) Fail to comply with known local customs of courtesy or practice of the bar or a particular tribunal without giving to opposing counsel timely notice of the lawyer's intent not to comply."

and wife, with respect to a recreational motor home that they had purchased and that they believed to be defective. The accused explored claims against Beaver Coaches, Inc. (Beaver), the dealer that sold the mobile home to the Nolans, and Caterpillar, Inc. (Caterpillar), the manufacturer of the motor home's engine. The accused had discussions with representatives of Beaver and Caterpillar.

On November 12, 1991, before a complaint was filed against Caterpillar, Bodyfelt wrote to the accused, advising him that Bodyfelt would be representing Caterpillar in any ensuing litigation. The letter stated:

"Dear Charlie:

"Re:  Noland[s] v. Caterpillar
"U. S. District Court (Eugene)

"Caterpillar has requested this office to represent it in the captioned matter and we intend to interpose an answer or other appropriate appearance in its behalf. Accordingly, may we assume that no default will be taken against Caterpillar without you[r] first giving this office notice in writing reasonably in advance of any such application? If you would like to effect service by mail, I will recommend that I be authorized to accept such service if you will prepare and tender the appropriate forms. I have discussed the case briefly with attorney Mike Melie, but I have not yet received Caterpillar's file. In any event, I do not expect that any extended delay will be necessary to prepare and file our first appearance."

After the accused received Bodyfelt's letter, but before he sent a reply, the accused discussed with the Nolans the possibility of obtaining a default judgment against Caterpillar. The accused testified to the trial panel as to the nature of that discussion:

"I told them there was a difference in State law and Federal law about defaults.[3] And that if I didn't hear — if we

---

[3] ORCP 69 A requires a party seeking default to give 10 days' written notice to opposing parties and provides in part:

"If the party against whom an order of default is sought has filed an appearance in the action, or has provided written notice of intent to file an appearance to the party seeking an order of default, then the party against whom an order of default is sought shall be served with written notice of the application for an order of default at least 10 days, unless shortened by the court, prior to entry of the order of default."

The Federal Rules of Civil Procedure do not contain such a notice requirement.

didn't get — if [Bodyfelt] didn't answer on time, I would have a right to put in for a default. At the same time I told him the chance of hanging on to it was very sparse.

"'* * * * *

"I told [the client], I said, 'You haven't got much of a chance. You have got a — if it shows he had the notice and he let the time go by, technically speaking, if Federal rules mean anything, if these rules should be enforced * * * so you would have a chance [if] [y]ou caught the judge on a good day of getting a default."

The Nolans told the accused that they wished to seek a default, and the accused acquiesced. The accused testified:

"[BAR PROSECUTOR]: If your client had not insisted on the default, you would have given notice, would you not?

"[THE ACCUSED]: Let me make it clear. [The client] didn't insist. He doesn't — he can't — he can insist. He asked and he made out his case on the basis of what I told him that he wanted to, if you want to say it, roll the dice and see if the default would do any good. He was very disturbed by Caterpillar's attitude. [He f]elt he had been pushed around, and he wanted to — he wanted to use all the rights he had, and I understood that. And so [there was] no reason not to go ahead with it."

On November 14, 1991, after his conversation with his clients,[4] the accused replied to Bodyfelt's letter as follows:

"Dear Dick:

"Because of statute of limitation problems and agreements with Caterpillar and Beaver, I intend to file my complaint in the U.S. District Court here in Eugene early afternoon on

---

FRCP 12(a) (1987) provided in part:

"A defendant shall serve an answer within 20 days after the service of the summons and complaint upon that defendant * * *."

FRCP 55(a) provides:

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default."

[4] The accused testified:

"[BAR PROSECUTOR]: So that discussion you had with your client was before the letter went out?

"[THE ACCUSED]: Oh, yes."

Tuesday, November 19, 1991.

"I'll plan to serve you and will enclose the appropriate forms.

"When you've had an opportunity to review Caterpillar's file, particularly the two reports of experts sent to Caterpillar by fax yesterday, you might give me a call if you think further extending the statute of limitations could lead to an appropriate settlement.

"I anticipate no problems in allowing extra time for your appearance."

On November 19, 1991, the accused, on behalf of the Nolans, filed an action against Caterpillar. The accused served Bodyfelt by mail, as Bodyfelt had suggested, and Bodyfelt began to prepare for his appearance in the case. The parties had no further contact with regard to an extension of time or an application for default. The accused testified at trial, however, that the Nolans called repeatedly to find out whether Caterpillar's time to file an answer to the complaint had expired.

On December 31, 1991, without prior notice to Bodyfelt, the accused obtained a default order against Caterpillar. The accused testified that he did not contact Bodyfelt before applying for the default, because "[his] client wanted to have an opportunity [to obtain a default] and [he] was not going to deny [his] client an opportunity by tipping off Mr. Bodyfelt." On January 3, 1992, Bodyfelt was served by mail with copies of the accused's "application for default" and "notice for entry of default by the court." Bodyfelt immediately moved to set aside the entry of default against Caterpillar.[5] The accused resisted the motion. On February 18, 1992, the court granted Caterpillar's motion to set aside the entry of default. The litigation then proceeded in a normal manner.

The foregoing facts, on which the misrepresentation charge is based, are not in dispute. The letters quoted above

---

[5] FRCP 55(c) provides:

"For good cause shown the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b)."

FRCP 60(b) provides in part:

"On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for * * * mistake, inadvertence, surprise, or excusable neglect * * *."

contain the only relevant communication between Bodyfelt and the accused. The accused now emphasizes the word "anticipate" in his letter to Bodyfelt and argues that the response was not intended as a "yes" answer to Bodyfelt's question. The accused testified:

> "[THE ACCUSED]: * * * The letter that I wrote to Mr. Bodyfelt was not meant to say yes at all. It was meant to be kinder than saying a flat, 'No, you don't get any slack.' What I was saying was, 'You want to talk to me about it within the time that you're allowed, I'll see what I can do, and there may be a chance.'
>
> "Because if he had asked within the time, I would have told my client, 'We have no — that's it. He's asked. He wants time. He's shown me why he needed time.' And I would have told my client. We would have done it that way.
>
> "[BAR PROSECUTOR]: Why would you have told your client we're going to do it that way?
>
> "[THE ACCUSED]: Because we had done our best. We had done what happened. If he acted timely, I knew we had no chance in court of winning on a default if he had asked and showed me good — showed me grounds, we couldn't possibly win."

The accused also testified that his letter to Bodyfelt "was accurate to the extent it should have told him — it was meant to tell him, 'You ask and I will see what I can do, but I can't promise you that you are going to get an approval. It's chancy.' "

The accused's protestations cannot be reconciled either with what he wrote or with the discussion concerning default that he had just had with Bodyfelt and that the accused himself acknowledges. The accused did *not* write to Bodyfelt and tell Bodyfelt, as the accused now claims, that Bodyfelt could call and ask for more time and might be given it. In the sentence immediately preceding the accused's statement that he "anticipate[d] no problem in allowing extra time for [Caterpillar's] appearance," the accused wrote, "you might give me a call *if you think further extending the statute of limitations could lead to an appropriate settlement.*" (Emphasis supplied.) The contrast between those two sentences illustrates that the accused knew how to invite a response when it was in his interest to do so (*i.e.*, to extend the

statute of limitations), and he knew how to make a response appear unnecessary when such a response was not desired. The accused knew that his client wished to seek a default judgment against Caterpillar *before* the accused replied to Bodyfelt that he "anticipate[d] no problem in allowing extra time for [Caterpillar's] appearance." The accused planned to seek that default, unless Bodyfelt inquired again about extending the time for Caterpillar's appearance. For the accused to couch his letter in a manner designed to mask that intent and not "tip[] off Mr. Bodyfelt" is the worst sort of sharp practice. We find by clear and convincing evidence that the accused is guilty of making a misrepresentation in violation of DR 1-102(A)(3).

## DR 7-106(C)(5)

We turn now to a discussion of "known local customs of courtesy or practice of the bar or a particular tribunal," as that concept is used in DR 7-106(C)(5). This court has not interpreted DR 7-106(C)(5) in any previous disciplinary proceeding.

We note at the outset of our discussion that we conclude that we need not decide in this case whether the accused is guilty of this charge. As we shall explain, the accused's misrepresentation so overshadows any finding that we might make as to this charge that resolution of the issue of guilt or innocence of this charge is irrelevant. We would not — on the facts before us — impose a greater sanction on this accused for violating DR 7-106(C)(5) than the sanction that we would in any event impose for the accused's violation of DR 1-102(A)(3) alone. We therefore do not decide, in this case, whether there was in fact the alleged custom in the federal court bar in Eugene. We nonetheless address certain arguments made by the parties concerning this disciplinary rule, in order to provide guidance in future cases.

The accused argues as an overarching matter that, if a lawyer complies with all of the procedural courtesies required by the Federal Rules of Civil Procedure (FRCP), the lawyer *cannot* be guilty of an ethical violation. To hold otherwise, he argues, would be to recognize an "amendment" to the FRCP in the Code of Professional Responsibility (Code). That argument is unpersuasive. The Code does not "amend"

the FRCP, or any other set of statutes or rules, by imposing ethical restrictions on a lawyer's conduct. Instead, the Code is a separate source of applicable substantive law. A lawyer is *not* absolved of all professional responsibility merely because the lawyer practices in federal court.[6]

■　　The accused also argues that, so long as the lawyer's actions are in strict accordance with the dictates of FRCP 12(a) (1987) and 55(a), the lawyer should not be found guilty of a disciplinary rule violation. This appears to be a claim that, although the Code and the FRCP may co-exist, compliance with a federal rule should be deemed to be a valid *defense* to a violation of DR 7-106(C)(5). The history, text, and context of DR 7-106(C)(5) defeat that argument.

DR 7-106(C)(5) is a part of Disciplinary Rule 7, which deals with "Zealously Representing Clients Within the Bounds of the Law." Each provision of DR 7-106(C) provides a limitation on the actions of a lawyer appearing in the lawyer's "professional capacity before a tribunal."[7] All but

---

[6] Indeed, the local federal court rules recognize as much. Rule 110-3 of the "Local Rules of Practice for the United States District Court for the District of Oregon" provides that "[e]very member of the Bar of this court and any attorney permitted to practice in this court shall be familiar and comply with the standards of professional conduct required of members of the Oregon State Bar * * *."

[7] DR 7-106(C) provides:

"In appearing in the lawyer's professional capacity before a tribunal, a lawyer shall not:

"(1) State or allude to any matter that the lawyer has no reasonable basis to believe is relevant to the case or that will not be supported by admissible evidence.

"(2) Ask any question that the lawyer has no reasonable basis to believe is relevant to the case and that is intended to degrade a witness or other person.

"(3) Assert the lawyer's personal knowledge of the facts in issue except when testifying as a witness.

"(4) Assert the lawyer's personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant or as to the guilt or innocence of a criminal defendant but the lawyer may argue, on the lawyer's analysis of the evidence, for any position or conclusion with respect to the matters stated herein.

"(5) Fail to comply with known local customs of courtesy or practice of the bar or a particular tribunal without giving to opposing counsel timely notice of the lawyer's intent not to comply.

"(6) Engage in undignified or discourteous conduct which is degrading to a tribunal.

"(7) Intentionally or habitually violate any established rule of procedure or evidence."

two of those provisions relate to rules of procedure or evidence. The remaining two, DR 7-106(C)(5) and (6), provide sanctions for conduct in violation of "known local customs of courtesy or practice of the bar or a particular tribunal" and for "undignified or discourteous conduct * * * degrading to a tribunal," respectively. The very next provision, DR 7-106(C)(7), makes any intentional or habitual violation of established rules of procedure or evidence an ethical violation. It is clear from the text and context of DR 7-106(C) that its provisions prohibit violations of "customs" and "rules" separately. History shows how that came about.

Oregon's ethical rules and standards of professional conduct *began* as customs of courtesy and practice. There was nothing else. Until 1881, no state had a "code" of ethics. A bar could govern itself only through social sanctions for failure to comply with local customs and courtesies. The first nationwide body of professional "Canons" did not appear until 1908, when the American Bar Association (ABA) approved 32 "Canons of Professional Ethics." *See* Henry Jessup, *The Professional Ideals of the Lawyer*, xxiii-xxvii (1925) (providing early history). Those Canons were adopted, in part, by this court and the then-recently organized Oregon State Bar (Bar) in 1935. Rule 29 of those "Rules of Professional Conduct of the Oregon State Bar" (ABA Canon 24) provided:

> "*A member of the state bar shall not ignore known customs or practices of the bar of a particular court, even when the law permits, without giving timely notice to opposing counsel.* As far as possible, agreements affecting the rights of clients should be reduced to writing; but it is dishonorable to avoid performance of an agreement fairly made because it is not reduced to writing, as required by rules of court."

(Emphasis supplied.)

The "Canons," as adopted by the Bar, were not mandatory disciplinary rules but were, instead, a set of hortatory principles voluntarily followed. Geoffrey C. Hazard, Jr., *Ethics in the Practice of Law*, 19 (1978). It was not until January 1, 1970, that the ABA adopted a more stringent set of rules aimed at the regulation of professional conduct. This "Model Code of Professional Responsibility," under which the Bar largely still operates, was adopted by the Bar on

December 30, 1970.[8] *See Burke v. Rachau*, 262 Or 323, 334 n 2, 497 P2d 1154 (1972) (providing history of the "customs of courtesy or practice" provisions in the Code of Professional Responsibility).

Although DR 7-106(C)(5) is an outgrowth of the ABA's Model Code, it is entirely consistent with Oregon's prior practice. For example, in *Ainsworth v. Dunham*, 235 Or 225, 231, 384 P2d 214 (1963), counsel argued before this court that his decision not to provide notice of default to opposing counsel was in part due to the "accepted ethical admonition to put one's client's cause foremost." This court answered:

> "We disagree * * * with [counsel's] views on an attorney's duties and ethics. We approve of the following sections of the Code of Trial Conduct of the American College of Trial Lawyers pertaining to [the subject of notices of default]:
>
> " '13. The lawyer, and not the client, has the sole discretion to determine the accommodations to be granted opposing counsel in all matters not directly affecting the merits of the cause or prejudicing the client's rights, such as extensions of time, continuances, adjournments and admission of facts. In such matters no client has a right to demand that his counsel shall be illiberal or that he do anything therein repugnant to his own sense of honor and propriety.
>
> " '14. (a) * * * *When he knows the identity of a lawyer representing an opposing party, he should not take advantage of the lawyer by causing any default or dismissal to be entered without first inquiring about the opposing lawyer's intention to proceed.*
>
> " '(b) A lawyer should avoid disparaging personal remarks or acrimony toward opposing counsel, and should remain wholly uninfluenced by any ill feeling between the respective clients. * * *.' "

*Ibid.* (emphasis supplied).

---

[8] The Bar presented the Disciplinary Rules in the then-newly adopted Model Code to this court under the title "Oregon Code of Professional Responsibility." This court adopted the Disciplinary Rules as binding authority on August 11, 1971. *In re Tonkin*, 292 Or 660, 664, 642 P2d 660 (1982). The ABA adopted a new set of "Model Rules of Professional Conduct" on August 2, 1983. Those "Model Rules" do not include a provision analogous to DR 7-106(C)(5); neither have they been adopted in Oregon.

The context of DR 7-106(C)(5), as explained by this court in *Burke*, further illustrates how the disciplinary rule codified an existing Oregon expectation. The Code, as adopted by the Bar in 1970, included "canons," "ethical considerations," and "disciplinary rules."

> "Canon 7 of that Code, * * * after providing that 'a lawyer should represent a client zealously within the bounds of the law' added various 'ethical considerations', including the following:
>
>> " 'EC 7-38 * * * He should follow local customs of courtesy or practice, unless he gives timely notice to opposing counsel of his intention not to do so.' "

*Burke*, 262 Or at 334-35 n 2. This court noted in *Burke* that a claim under DR 7-106(C)(5) was "similar," and in accordance with *Ainsworth*. *Id.* at 334. The *Burke* court added:

> "Rule 14(a) [quoted in *Ainsworth*, 235 Or at 231] also provides that:
>
>> " '*A lawyer* should adhere strictly to all express promises and agreements with opposing counsel, whether oral or in writing, and *should adhere in good faith to all agreements implied by the circumstances or by local custom.*' "

*Burke*, 262 Or at 334 n 2 (emphasis supplied). The court then proceeded to cite the aforementioned rule, canons, ethical considerations, and DR 7-106(C)(5) as standing for equivalent propositions.

It is true that neither *Ainsworth* nor *Burke* was a disciplinary case. In both cases, the question before this court was whether a default judgment, entered by the trial court, should have been set aside by the trial court due to "mistake, inadvertence, surprise or excusable neglect." *See former* ORS 18.160 (now ORCP 71 B(1)(a)) (stating standard). In *Ainsworth*, the default was set aside, and the lawyer taking the default was criticized for not providing notice of the default to the opposing lawyer. In *Burke*, the defaulted party, an insurance company, had expressly agreed with the opposing party's lawyer that it would obtain a lawyer and file an appearance by December 19, 1969. This court held that the agreement between the defaulted party and the opposing lawyer provided adequate notice that default would be taken after that date.

Although neither *Ainsworth* nor *Burke* dealt exclusively with the ethics question, both holdings were consistent with DR 7-106(C)(5) of the Code and both serve to illuminate the history and spirit behind that Disciplinary Rule. Both stand for the proposition that a customary practice of civility or courtesy should be followed, despite the absence of a rule requiring such courtesy. *See Rules of Professional Conduct of the Oregon State Bar*, Rule 29 (1935) ("a member of the State bar shall not ignore known customs or practices of the bar or of a particular court, even when the law permits, without giving timely notice to opposing counsel"). Accordingly, we hold that it is no defense to a charged violation of DR 7-106(C)(5) that the offender's acts were in compliance with another rule, where what is required — as opposed to what simply is permitted — by that other rule is not inconsistent with the obligation imposed by DR 7-106(C)(5). We turn now to our discussion of the accused's remaining arguments.

The accused argues that, to prove the existence of a custom, the Bar must prove that a practice was "ancient, notorious, uniform, not opposed to a well settled rule of law, and not inconsistent with the contract of the parties." *See Port Invest. Co. v. Oregon M. F. Ins. Co.*, 163 Or 1, 18, 94 P2d 734 (1939) (citation omitted) (stating that standard). We agree that the strong influence of the common law on the enacted rule requires that the definition of "custom" also derive from the common law, but disagree with the accused as to the common law definition of "custom" that is applicable to this case. We turn now to that question.

The term "custom" has been used in Oregon jurisprudence, in varying contexts, to mean as little as "a practice or course of acting," *Hughes v. Heppner Lumber Co.*, 205 Or 11, 41, 283 P2d 142 (1954) (Warner, C. J., dissenting) (interpreting a contract), *reh den* 205 Or 56, 286 P2d 126 (1955), or as much as an ancient, continuous, peaceful, reasonable, certain, obligatory, practice not inconsistent with other customs or laws, *State ex rel Thornton v. Hay*, 254 Or 584, 595-98, 462 P2d 671 (1969) (applying English common law doctrine of custom to a land dispute). The accused offers, as the appropriate definition of "custom," an opinion that purportedly applied the English common law definition of custom to a contract dispute. *Port Invest. Co.*, 163 Or at 18 (citing

*Coxe v. Heisley*, 19 Pa St 243 (1852) (applying English common law)). In fact, however, the *Port Invest. Co.* court never reached the question whether the "custom" in question was "ancient, notorious, uniform, [or] not opposed to a well settled rule of law[.]" The alleged "custom" in *Port Invest. Co.* contradicted the specific terms of the contract in that case and, thus, could not be admitted to "change" those terms. *Ibid.* (citing *Interior Warehouse Co. v. Dunn*, 80 Or 528, 534, 157 P 806 (1916)). The *Port Invest. Co.* case, thus, is a case that only contains a *dictum* on what the idea of "custom" means. We decline to rely on that *dictum*.

The practice of law is a professional calling. With respect to such an enterprise, it seems most logical to us to look to the way the concept of "custom" has developed in our common law with respect to a trade or calling. In that area, we generally require that, in order to be called a "custom," a practice must be uniform, *Barnard & Bunker v. Houser*, 68 Or 240, 243, 137 P 227 (1913), and well known to the community, *Green Mt. L. Co. v. C. & N. R. R.*, 141 Or 188, 195, 16 P2d 1106 (1932). This court has held:

> "Evidence that a certain course is generally and usually pursued in a particular manner is sufficient to establish a custom. It is not essential to show that there has been no deviation from such particular manner. It is sufficient if a custom be so general and uniform that it may be said to have become a part of the [governing contract]."

*Id.* at 195-96.

> " 'A custom has the force of law, and furnishes a standard for the measurement of many of the rights and acts of men. It must be certain, or the measurements by this standard will be unequal or unjust. It must be uniform; for, if it vary, it furnishes no rule by which to mete. It must be known, or must be so uniform and notorious that no person of ordinary intelligence who has to do with the subject to which it relates, and who exercises reasonable care, would be ignorant of it; * * * ' "

*Hellbusch v. Rheinholdt*, 275 Or 307, 312, 550 P2d 1199 (1976) (quoting Samuel Williston, 5 *Law of Contracts* 10-11, § 649 (Walter H. E. Jaeger ed., 3d ed 1961)). The existence of a custom or usage is a matter of fact and not of opinion. *Green Mt. L. Co.*, 141 Or at 192. "The method of proving custom is

analogous to that of proving reputation." *Ibid.* "[Custom] is proved, not by witnesses testifying as to their opinions, but as to its existence from facts within their own knowledge, obtained by observation of what is practiced by themselves and others in the trade or business to which it relates." *Holmes v. Whitaker*, 23 Or 319, 325, 31 P 705 (1892) (citations omitted).

■ The foregoing discussion of the law of custom appears to us to be most compatible with the concept of a custom used in a profession. We hold that, in the context of DR 7-106(C)(5), a custom is a particular course of acting or dealing "so general and uniform" that it has taken on the status of an unwritten law governing practitioners in a particular community. It must also be "certain" and "known, or * * * so uniform and notorious that no person of ordinary intelligence who has to do with the subject to which it relates, and who exercises reasonable care, would be ignorant of it." *Hellbusch*, 275 Or at 312.

■ The accused alternatively argues that, in order for a lawyer to violate DR 7-106(C)(5), the lawyer must *personally* know of the alleged custom. DR 7-106(C)(5) provides for the discipline of lawyers who "fail to comply with *known* local customs of courtesy or practice of the bar." (Emphasis supplied.) The accused interprets that wording to require "actual knowledge" of the existence of the custom as it is defined by common law. We disagree. Indeed, placing such a burden would negate the concept of "custom," placing a premium on studied stupidity by practitioners who assiduously avoid learning about the community in which they practice.

■ A party at common law, seeking to establish the existence of a custom, need not prove that the person to be bound had "actual knowledge" of each element of the custom. The party need only prove the existence of the custom to the finder of fact. *Holmes*, 23 Or at 325; *Green Mt. L. Co.*, 141 Or at 192. If the custom exists in the "community," *i.e.*, the trade or calling in the relevant locale to which the person to be bound belongs, the person to be bound is *deemed* to know of it and, by nature of its being a "custom," is bound by it. We do not understand the word "known," in DR 7-106(C)(5), to place the burden of proving "actual knowledge" by the accused of each element of a custom on the Bar, where the

custom, *by its very definition,* is "known." Put differently: The word "known" modifies the word "custom," not the lawyer's state of mind. If a custom is demonstrated by clear and convincing evidence at a hearing, and it must be generally known for it to be demonstrated, the accused "knows" of it by operation of law.

As noted, we have included the foregoing discussion of DR 7-106(C)(5) in this opinion in order to assist the Bar and its members in future proceedings under that rule. However, and also as noted, we do not make any evidentiary findings under the rule in this case, because no such findings would affect our choice of sanction. We turn to that final issue now.

## SANCTION

■ When imposing a sanction for unethical conduct, this court follows the American Bar Association's *Model Standards for Imposing Lawyer Sanctions* (1992). Under those standards, we consider four factors: (1) the duty violated; (2) the accused's mental state; (3) the potential or actual injury caused by the misconduct; and (4) aggravating or mitigating factors. ABA Standard 3.0.

The duties violated in this case are substantial. By misrepresenting his intent to seek a default in the Nolans' case, the accused violated his duty to maintain the standards of personal integrity on which the legal community, and the larger community, rely. This most fundamental duty, owed by a lawyer to the public, is critical to public confidence in the legal profession and is undermined by dishonest or discourteous conduct. ABA Standard 5.0. In the absence of aggravating or mitigating circumstances, the ABA Standards recommend a reprimand for conduct that involves "dishonesty, fraud, deceit, or misrepresentation * * * that adversely reflects on the lawyer's fitness to practice law." ABA Standard 5.13.

The accused's misconduct was also a blatant violation of his duty owed to the profession as a professional. Conduct by which one lawyer seeks to dupe another lawyer (and the latter's client) tears at the fabric of the legal profession, which can expect to have no better reputation for trustworthiness in the community than that of its worst actors. Misconduct of the kind demonstrated here not only

damages the reputation of the legal profession, but also breeds distrust among practitioners, tempting rational lawyers to follow suit, rather than be made the fool. ABA Standard 7.2 recommends suspension "when a lawyer knowingly engages in conduct that is a violation of duty owed as a professional, and causes injury or potential injury to * * * the legal system." ABA Standard 7.2.

ABA Standard 8.2 further recommends suspension "when a lawyer has been reprimanded for the same or similar misconduct and engages in further acts of misconduct that cause injury or potential injury to * * * the profession." The accused has been the subject of numerous prior disciplinary reprimands. *See In re Charles O. Porter*, 268 Or 417, 521 P2d 345, *cert den* 419 US 1056, (1974) (five separate improper statements to the media with respect to pending litigation); *In re Charles O. Porter*, 283 Or 517, 584 P2d 744 (1978) (representing parties with conflicting interests). Further, the accused was admonished in 1985 for improperly soliciting clients. Finally, and perhaps most importantly, the accused was admonished again, in 1991, for engaging in conduct involving a misrepresentation to a court[9] that was prejudicial to the administration of justice.

The mental state of the accused is clear from the record at trial. The evidence that the accused knew that he was walking the line between acceptable and unacceptable conduct is manifest. The accused's own testimony demonstrated that he knew at the time that he wrote his reply to Bodyfelt that his client wished to seek a default in the case. He also knew that Bodyfelt planned to make an appearance. The accused's reply to Bodyfelt's letter, communicating that the accused "anticipate[d] no problem in allowing extra time for [Bodyfelt's] appearance," was a deliberate misrepresentation designed to avoid a direct answer to Bodyfelt's question, while not "tipping off" Bodyfelt to the fact that the Nolans *planned* to seek a default.

---

[9] In the earlier misrepresentation case, the accused was admonished for petitioning a court for approval of the sale of certain probate assets, without disclosing to the court that those assets already had been sold. The accused's acts of misrepresentation in the present case occurred less than three months after he had received the earlier admonition.

The injury caused by the accused's misconduct has already been discussed. The accused's actions caused unnecessary delay in the Caterpillar case and threatened actual or potential injury to the substantive legal interests of the party against which the default was taken.

The last factor that the ABA Standards direct us to consider is whether aggravating or mitigating factors act to increase or decrease the recommended sanction. We find the existence of the following aggravating factors: Prior disciplinary offenses (ABA Standard 9.22(a)), dishonest motive (ABA Standard 9.22(b)), a pattern of misconduct (ABA Standard 9.22(c)), and substantial experience in the practice of law (ABA Standard 9.22(i)). In mitigation of the offenses, the accused demonstrated full and free disclosure to the trial panel and a cooperative attitude toward the proceedings (ABA Standard 9.32(e)). The aggravating factors predominate.

On balance, the ABA Standards call for a period of suspension in cases such as the present one. The trial panel imposed a sanction of suspension from the practice of law for 30 days. The Bar also asks this court to suspend the accused from the practice of law for a period of 30 days, although the Bar makes special note of the temporal proximity between the earlier admonition for misrepresentation and the accused's present offense. We, too, find that proximity particularly troubling.

■ Although we always consider the sanctions chosen by the trial panel, this court's authority in the selection of a sanction is plenary. We have on many occasions increased a sanction on review, based on our independent assessment of the totality of the circumstances. *See, e.g., In re Leonard*, 308 Or 560, 572, 784 P2d 95 (1989) (accused suspended for 35 days, although trial panel recommended only a reprimand); *In re Miller*, 303 Or 253, 260, 735 P2d 591 (1987) (accused disbarred where Bar did not seek that sanction). The accused's history, including a prior act of misrepresentation and two published opinions of this court admonishing him for his conduct, together with earlier decisions of this court that dealt with violations of DR 1-102(A)(3),[10] lead us to conclude

[10] *See, e.g., In re Smith*, 315 Or 260, 264-67, 843 P2d 449 (1992) (four-month suspension, fewer aggravating factors); *In re Magar*, 312 Or 139, 142, 817 P2d 289 (1991) (60-day suspension).

that a longer suspension is warranted in this case. We suspend the accused from the practice of law for 63 days.[11]

The accused is suspended from the practice of law for 63 days.

**FADELEY, J.,** concurring.

I concur in the portion of the opinion finding a violation of DR 1-102(A)(3). The accused's letter and the other circumstances surrounding the application for default without notice, when taken together, show conduct involving dishonesty and misrepresentation in violation of DR 1-102(A)(3). I write separately to underline the difference between that rule — requiring probity in transactions between members of the law profession — and the legal norm or rule that a majority has applied, over my dissent, to transactions between persons engaged in business in *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 166, 168, 843 P2d 890 (1992) (Fadeley, J., concurring in part and dissenting in part: concurring that there is a tort of negligent misrepresentation, recognized in Oregon; but dissenting from the view that the tort remedy is not applicable to business negotiations conducted "at arm's length").

DR 1-102(A)(3) enforces the same standard of conduct as stated in Restatement (Second) of Torts § 552(1) (1977).[1] The Restatement rule, requiring honest representations, evenhandedly applies that rule to "business, profession or employment, or in any other transaction in which he [or she] has a pecuniary interest." However, *Onita* renders that standard inapplicable to the plaintiff and defendant in this

---

[11] We emphasize that our choice of sanction is not based on any implicit conclusion that the accused is also guilty of violating DR 7-106(C)(5). We have not made any determination of the accused's guilt or innocence under that charge, because — again, as we have explained — a finding one way or the other on that charge would not have altered our choice of sanction.

[1] Restatement (Second) of Torts § 552(1) provides:

"One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

case, because those parties were dealing "at arm's length" in a business transaction.

The legally mandated standard governing the conduct of lawyers amongst themselves while engaged in the practice of law is one that this court, erroneously, will not apply to transactions between business people. Put another way, a lawyer's business client is able to engage in sharper practices in relation to the persons with whom the business person is completing a business transaction than may the lawyer. Certainly the lawyers in this case had clients who were dealing with each other at arm's length, and the lawyers were under a duty to advocate for their clients to the limit the law allowed. The accused's client required him to take a default, as permitted by a federal rule of procedure, and to do so without notifying the lawyer on the other side. Under those circumstances, the accused's letter to the other lawyer, quoted in the lead opinion, misrepresented the accused's intention. Applying *Onita*, the accused's conduct, were this simply a business transaction, would have been permissible.[2] Under the Code of Professional Responsibility, however, it is not. Thus, DR 1-102(A)(3) prevents — as between the lawyers — what the *Onita* majority expressly allows as between their respective clients. In short, the client has a right to mislead that the lawyer-advocate does not.

Recently, a majority of the court has also relegated the implied covenant of good faith and fair dealing between business persons to some sort of legal museum for former remedies that are no longer used. *Compare Best v. U.S. National Bank*, 303 Or 557, 562, 739 P2d 554 (1987) (holding that the purpose of that covenant "is to prohibit improper behavior in the performance and enforcement of contracts"), *with Pacific First Bank v. New Morgan Park Corp.*, 319 Or 342, 876 P2d 761 (1994) (a 4-2 decision).

---

[2] In *Onita*, the younger Bronson told a buyer-assignee that lots in a Deschutes County residential development would be released for development or resale by the buyer after certain payments were made. The buyer plowed about a million dollars of assets into those payments, but the elder Bronson, who benefited from the payments and acquired the ability to release the lots in question to his own joint venture because of those payments, refused to release them to his buyer-assignee, thereby financially breaking the buyer. Bronson was, by the *Onita* majority, held legally blameless because the negotiations had been at arm's length and, therefore, no account could be taken of the misrepresentation by which Bronson profited and the buyer who received nothing in return for his money went belly-up.

In my view, however, the law applicable to the business world requires it to live by the same standard as applies to transactions between lawyers. I would also apply to "business" transactions the same rule of honesty and good faith that we require within the legal profession. I believe that is the community norm today, in both Oregon's business and legal communities. I want that norm to continue. I write separately here in the hope that the majority will see the light and return our commercial law to principles requiring rectitude between business people equal to that required between lawyers in the representation of clients.

Perhaps my point regarding the importance of requiring honesty of representation in all areas of law, not just between lawyers, is thoughtfully illustrated by Margaret Thatcher in a 1994 lecture delivered at Hillsdale College in Michigan. She said:

> "The most important problems we have to tackle today are problems, ultimately, having to do with the moral foundations of society. There are people who eagerly accept their own freedom but do not respect the freedom of others — they, like the Athenians, want freedom from responsibility. But if they accept freedom for themselves, they must respect the freedom of others. If they expect to go about their business unhindered and to be protected from violence, they must not hinder the business of or do violence to others." Margaret Thatcher, *The Moral Foundations of Society*, 24 Imprimis No. 3, at 3 (March 1995).