Argued and submitted May 7, accused suspended from the practice of law
for two years June 5, 1998

In re Complaint as to the Conduct of

# WILLIAM B. WYLLIE,
*Accused.*

(OSB 96-46, 96-190; SC S40929)

957 P2d 1222

William B. Wyllie, Salem, argued the cause and filed the brief *in propria persona*.

Mary Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar.

Before Gillette, Presiding Justice, and Van Hoomissen, Durham, Kulongoski, and Leeson, Justices.*

PER CURIAM

---

* Carson, C. J., did not participate in the consideration or decision of this case.

## PER CURIAM

In this lawyer discipline case, a trial panel of the Oregon State Bar (Bar) found the accused guilty of two violations of the Code of Professional Responsibility and imposed a sanction of a seven-month suspension. *De novo* review by this court is automatic. ORS 9.536(2), (3); Oregon State Bar Rules of Procedure (BR) 10.1, 10.6. After that review, we conclude that the accused is guilty of the misconduct charged. We impose a sanction of two years' suspension from the practice of law, with the suspension to be served consecutively to that imposed on the accused in *In re Wyllie*, 326 Or 447, 952 P2d 550, *on recons* 326 Or 622, 956 P2d 951 (1998).

The charges against the accused were based on the following historical facts. In January 1995, the accused was required to submit to the Minimum Continuing Legal Education (MCLE) Board a report showing that he had completed the required 45 credit hours of accredited continuing legal education (CLE) activity for the reporting period from January 1, 1992, through December 31, 1994. The accused submitted such a report on January 23, 1995. That report stated that the accused had "individually screened" 40.5 hours of taped CLE materials in November and December 1994. The report did not identify the specific dates on which the accused claimed to have reviewed those materials. As part of the report, the accused signed an affidavit, under oath, stating that he had "participated in the CLE activities and earned the MCLE credits listed in [the] report on the dates specified in [the] report."

Thereafter, the accused's report was selected for audit, because the accused claimed to have listened to such a significant amount of materials over such a short period of time but did not list specific dates for any of those activities. The MCLE administrator contacted the accused in May 1995 and requested more detailed information.

The materials involved were on nine separate tapes. The accused told the administrator that he had obtained all of the tapes from the Professional Liability Fund (PLF). The administrator found that the PLF had no record of the

accused having ordered six of the nine tapes. Additional investigation disclosed that there was no independent record to substantiate the accused's separate claim that he had attended certain live CLE presentations. The administrator disallowed the credits claimed for those programs, along with the credits claimed for screening the disputed tapes. In all, the MCLE Board disallowed a total of 27.5 credit hours that the accused had claimed.

The MCLE Board then informed the accused by letter that he was not in compliance with MCLE requirements and directed him to cure that noncompliance by completing the 27.5 hours of instruction and paying a late fee of $150. The accused eventually did make up the CLE deficiency for the 1992-94 reporting period and paid the late fee. He was found to be in compliance on October 2, 1995.

Meanwhile, the MCLE Board filed a complaint with the Bar Disciplinary Counsel's Office pursuant to MCLE Rule 7.3(d).[1] After an initial investigation by the Disciplinary Counsel's Office, the matter was referred to the Clackamas/Linn/Marion County Local Professional Responsibility Committee (LPRC) for investigation. An LPRC investigator met with the accused and told him that the PLF had no record of his having borrowed certain CLE materials from it. The accused immediately changed his story. He told the investigator that either he or his law clerk had borrowed the tapes from the Willamette University College of Law School library. The accused also told the investigator that he had obtained the tapes in the same month that he had listened to them and that he specifically recalled listening to all of the tapes at the end of the reporting period, because he did not like doing so.

The investigator attempted to verify the accused's story by calling a librarian at Willamette. She discovered that the library had none of the six audio tapes to which the accused claimed to have listened. In fact, the library had never had more than one or two CLE audio tapes in its entire

---

[1] Rule 7.3(d) provides:

"The MCLE Board may, in its discretion, refer active members to the Oregon State Bar for further action where questions of dishonesty in reporting occur."

collection. In September 1996, the LPRC issued a report on its investigation, disclosing the foregoing facts.

The Bar filed a formal complaint against the accused in February 1997, charging him with violating DR 1-102-(A)(3) (conduct involving dishonesty, fraud, deceit, or misrepresentation) and DR 1-103(C) (requiring lawyers who are the subject of a disciplinary investigation to respond fully and truthfully to investigators). Before the hearing, the Bar took the accused's deposition, at which he testified that he personally had obtained some of the tapes from Willamette by removing them from the shelves and signing his name on a clipboard at the desk. He testified further that other tapes may have been borrowed on his behalf from Willamette by his former law clerk, Stewart.

At the disciplinary hearing, a Willamette law librarian testified that the claimed tapes were never part of the library's collection and that the tapes that the library did have were kept "on reserve" and could be obtained only by request. The librarian also testified that he and his supervisor had gone through all of the sign-out sheets for CLE materials of any type and did not find the accused's name listed anywhere. Additionally, Stewart testified that she did not recall giving the accused any CLE materials and that her own CLE records showed that she had not listened to any CLE audio tapes at any time during the accused's reporting period. When confronted with this testimony, the accused continued to insist that he was entitled to all the credits that he had claimed. However, he changed his story again, asserting that he had attended some of the programs—he was not entirely sure which ones—in person, rather than listening to the tapes. In substance, he acknowledged that he did not know where he had gotten the claimed audiotapes and that he was only guessing as to when (or even whether) he may have listened to them.

We find from the record that the foregoing historical facts are established by clear and convincing evidence. We turn to the question of what those facts mean, in light of the violations charged.

We first consider the charge that the accused is guilty of conduct involving dishonesty, fraud, deceit, or misrepresentation (DR 1-102(A)(3)). The accused asserts that the worst that he can be accused of is keeping poor records and relying on his memory in creating and submitting his CLE compliance report. He continues to assert that he either listened to all of the tapes that he said that he had listened to or actually attended the programs at which those tapes were generated and that the Bar cannot call him dishonest simply because he is a poor record keeper. The accused also argues that the focus of the complaint is misdirected, because he "cured" his noncompliance, as he was entitled to do under the MCLE rules. That, the accused seems to believe, should have ended the matter. Finally, the accused argues that, inasmuch as his claims of having listened to certain CLE tapes were incomplete on their face (because they contained no specific dates when the CLE activities allegedly were performed), those claims cannot represent an intentional effort to mislead anyone.

We reject each of the foregoing arguments. As our recitation of the historical facts shows, the proof that the accused misrepresented his CLE activities in his report is clear. The accused's own testimony shows that he did not believe the accuracy of some of the details of his MCLE report, but he swore to them nonetheless. The accused has told many different stories concerning how he claims to have complied with the MCLE requirements—so many, in fact, that it is impossible to believe any of them. All of the accused's various arguments are designed to turn attention away from that pivotal fact. Whether he is a good record keeper is irrelevant; he is not charged with keeping poor records. The issue is whether the accused is telling the truth concerning his CLE activities. We are satisfied that he is not.

Neither is it pertinent that the accused ultimately "cured" his MCLE deficiencies. He was required to do that in order to keep his license to practice law.

The accused's final argument is perhaps the most disturbing. He argues, in essence, that what he reported to the MCLE Board was too vague to be a lie. It was not. The

accused reported that he had listened to specific CLE material during a certain period of time. The degree of specificity that he used may not have met the requirements of the MCLE Board, but his report certainly alleged that specific and verifiable events had occurred. As noted, the accused swore in the report that they had. The evidence—including the accused's own testimony—shows that they had not.

We find the accused guilty of violating DR 1-102(A)(3).

We turn next to the charge that the accused violated DR 1-103(C) (failing to cooperate with the LPRC investigation). The accused claims, without elaboration, that the LPRC witness at the hearing "was unable to identify the titles of any of the tapes which she was inquiring about or which were discussed. In the context of this case her testimony is not clear and convincing evidence that Accused was untruthful to her." That argument is another diversion from the issue, and we reject it. The subject of the investigation was clear: whether and when the accused had listened to certain materials that the accused himself had identified in his MCLE report. The accused's failure to cooperate is equally manifest. His various false and misleading stories hampered the investigation, as the accused had to know that they would.

We find the accused guilty of violating DR 1-103(C).

We turn to the issue of sanction. In assessing an appropriate sanction for violations of the disciplinary rules, this court follows the template established in the American Bar Association *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards) and Oregon case law. *See, e.g., In re Stauffer*, 327 Or 44, 66, 956 P2d 967 (1998) (so holding and illustrating process). Under the ABA Standards, the court considers four factors: the duty violated, the accused's mental state, the actual or potential injury sustained, and any aggravating or mitigating circumstances. ABA Standard 3.0. We address each of those factors in turn.

1. *Duty violated*

The accused's actions violated two separate duties that he owed to the legal profession: the duty to deal honestly

with others, including his own professional organization, and the duty to cooperate with a legitimate inquiry from the Bar concerning whether he was complying with the Bar's disciplinary rules.

### 2. *Mental state*

Under the ABA Standards, an act is "intentional" if it is done with a conscious objective or purpose to accomplish a particular result. ABA Standards at 17. The accused acted intentionally with respect to each of the violations in this case. His purpose was to persuade the MCLE Board that he had complied with MCLE requirements. Each time that he told a story and each time that he changed it, he understood what he was claiming.

### 3. *Injury sustained*

The accused argues that he did not intend to deceive anyone, that he corrected his mistakes, that he did not make a misrepresentation to any court or tribunal, and that no one was harmed. We disagree. The MCLE Board, the Bar Disciplinary Counsel's Office, and the LPRC all were harmed by being required to conduct an extensive investigation that would not have been necessary if the accused simply had told the truth at the outset. The fact that those entities all are part of the Bar's administrative apparatus does not make the harm less significant. The Bar's work of administering the profession and protecting the public with a relatively small staff depends to a significant degree on the honesty and cooperation of the lawyers whom the Bar regulates. Systematic dishonesty in a lawyer's dealings with the Bar is destructive to the Bar's ability to carry out its vital tasks.

### 4. *Aggravating and mitigating factors*

The accused asserts that there are two mitigating factors: "restitution" (ABA Standard 9.32(d)) (in the form of the accused's eventual compliance with the MCLE requirements) and delay in bringing the proceedings (ABA Standard 9.32(i)). We reject both. The accused's "restitution" was required by the MCLE rules in order for him to be able to continue practicing law. MCLE Rule 7.6. The accused's eventual compliance with the MCLE requirements thus was in no

sense a form of restitution. We also find no unusual delay here, beyond that occasioned by the accused's own tactics in changing his stories as the case progressed.

The Bar asserts that several aggravating factors are applicable: a dishonest or selfish motive (ABA Standard 9.22(b)); deceptive practices during the disciplinary process (ABA Standard 9.22(f)); refusal to acknowledge the wrongful nature of the conduct (ABA Standard 9.22(g)); and substantial experience in the practice of law (ABA Standard 9.22(i)). The Bar also asserts that another aggravating factor, *viz.*, a prior disciplinary record (ABA Standard 9.22(a)), is present, but we decline to add that factor to the calculus. This court's earlier decision, *In re Wyllie*, 326 Or 447, 952 P2d 550, *on recons* 326 Or 622, 956 P2d 951 (1998), was rendered by this court only after the present case had been concluded at the trial panel level and had been briefed to this court. That fact diminishes the significance of that circumstance. *In re Jones*, 326 Or 195, 200, 951 P2d 149 (1997). We do find it to be appropriate, however, to treat the suspension imposed in that case as the baseline to which any suspension in the present case should be added.

A lengthy suspension is appropriate here. Indeed, ABA Standard 5.11 indicates that disbarment generally is appropriate when "a lawyer engages in * * * intentional conduct involving dishonesty, fraud, deceit or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice." Case law from this court also demonstrates that this court takes a particularly serious view of a lawyer's intentional use of known false documentation in the lawyer's dealings with the Bar. *See, e.g., In re Morin*, 319 Or 547, 878 P2d 393 (1994) (lawyer, who defended ethics complaint by falsely claiming that he had permitted a will to be witnessed improperly only once, when in fact he had caused over three hundred wills to be improperly witnessed, disbarred); *In re Yacob*, 318 Or 10, 860 P2d 811 (1993) (lawyer who presented fabricated documents to the Bar in response to an ethics complaint guilty of violating DR 1-102(A)(3) and DR 1-102(A)(4) and disbarred); *In re Brown*, 298 Or 285, 692 P2d 107 (1985) (lawyer prepared false affidavit for client in effort to fend off investigation by the Bar; suspended for two years).

The accused's misconduct in this case is both less serious and less clear-cut than was the conduct sanctioned in *Morin*, *Yacob*, or *Brown*: Our unwillingness to believe any of the accused's stories does not mean that we are satisfied, by clear and convincing evidence, that he did not in fact listen to any of the tapes. We have substantial doubts, but that is all. Nevertheless, the accused's misconduct was very serious. The accused has treated the MCLE reporting process and the LPRC investigation cavalierly, continuing to this moment to ask, in effect, "What's the big deal?"

Because of the seriousness of the accused's behavior, we disagree with the trial panel's choice of a seven-month suspension. Consistent with the ABA Standards and our case law, we conclude that a significantly longer period of suspension is appropriate. The accused is suspended for two years, with that period of suspension to run consecutively to that which the accused presently is serving as a result of this court's decision in *In re Wyllie*.

The accused is suspended from the practice of law for two years, with the period of suspension to run consecutively to the period of suspension imposed on the accused in *In re Wyllie*, 326 Or 447, 952 P2d 550, *on recons* 326 Or 622, 956 P2d 951 (1998).