Argued and submitted November 6, 2000, accused suspended for two years
June 1, 2001

In re Complaint as to the Conduct of

DANIEL Q. GALLAGHER,
*Accused.*

(OSB 98-12; SC S47248)

26 P3d 131

Daniel Q. Gallagher, Winston, argued the cause and filed the briefs *in propria persona*.

Mary A. Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the briefs for the Oregon State Bar.

Before Carson, Chief Justice, and Gillette, Durham, Kulongoski, Leeson, and Riggs, Justices.*

PER CURIAM

---

\* Van Hoomissen, J., retired December 31, 2000, and did not participate in the decision of this case; De Muniz, J., did not participate in the consideration or decision of this case.

## PER CURIAM

The Oregon State Bar (Bar) charged the accused by formal complaint with violating Code of Professional Responsibility Disciplinary Rule (DR) 1-102(A)(3) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation) (two counts); DR 1-103(C) (requiring cooperation with Bar investigation) (two counts); and DR 9-101(A) (requiring deposit and maintenance of client funds in trust account). In its first cause of complaint, the Bar alleged that the accused violated DR 1-102(A)(3) by attempting to accept a settlement offer made by opposing counsel when the accused knew that opposing counsel mistakenly had offered too much money and by failing to respond truthfully to the Bar's subsequent letter and in the Local Professional Responsibility Committee (LPRC) interview; DR 1-103(C) by failing to respond truthfully to the Bar and the LPRC; and DR 9-101(A) by failing to maintain in his trust account the funds that opposing counsel mistakenly had sent. In its second cause of complaint, the Bar alleged that the accused violated DR 1-102(A)(3) and DR 1-103(C) by failing to respond truthfully during a Bar deposition. A trial panel of the Disciplinary Board determined that the accused had violated all those rules and imposed a two-year suspension. Given that sanction, review by this court is automatic. ORS 9.536(2); BR 10.1. On *de novo* review, ORS 9.536(3); BR 10.6, we conclude that the accused committed two violations of DR 1-102(A)(3) and two violations of DR 1-103(C), and impose a two-year suspension.

We find the following facts. In 1996, the accused represented Driscoll in two contract disputes. In the first contract, Driscoll, who owned a livestock business, had contracted with Hanna to have two of Hanna's mares bred to one of Driscoll's stallions. In the second contract, Driscoll had sold a horse to Hanna. Hanna had taken possession of that horse and had executed a promissory note as payment. Hanna eventually defaulted on both contracts.

In March 1996, the accused and Hanna's lawyer, Martinis, began settlement negotiations. On May 16, 1996, Martinis sent a settlement offer to the accused and enclosed two cashier's checks. One check, numbered 2827681, was in

the amount of $1,610 and had the notation "Bay poco filly * * * paid in full" on its face. The other cashier's check, numbered 2827682, was in the amount of $600 and had the notation "Breeding fee * * * paid in full." Martinis also included a general release form with the checks. The accused communicated the settlement offer to Driscoll; Driscoll rejected it, and the accused returned the checks.

In June 1996, the accused filed a breach of contract action on Driscoll's behalf. Negotiations resumed. Soon, the parties seemed close to settlement: They both agreed that Hanna would pay Driscoll $1,400 in breeding fees and that Hanna would return the horse. The only point of dispute was whether Hanna also would pay Driscoll's attorney fees.

On November 21, 1996, the accused sent a settlement offer to Martinis with the following terms: (1) Hanna pays Driscoll $1,400 for breeding fees; (2) Hanna pays Driscoll's attorney fees; (3) Hanna returns the horse if a veterinarian finds the horse to be in good health, but if the horse is in poor health, then Hanna pays the balance of the purchase price; (4) Driscoll delivers the breeding certificates to Hanna; and (5) Driscoll dismisses the lawsuit.

On November 25, 1996, Martinis sent a letter in reply to the accused. That letter, and the accused's conduct in reaction to that letter, form the bases for the DR 9-101(A) charge and for one of the DR 1-102(A)(3) charges. The November 25 letter stated, in part:

"Please be advised that your client's counter offer set forth in your letter to me dated November 21, 1996 is rejected. Under no circumstances will my client agree to pay your client's attorney fees. All other points of your counter offer are acceptable.

"I enclose herein two cashier's checks numbered 2827681 and 2817682 [sic] in the amounts of $1,610.00 and $600.00, respectively. These checks are submitted to you in full satisfaction of the above-referenced matter.

"Your client's acceptance and negotiation of these checks, however, is conditioned upon her full performance of her end of the settlement agreement as specified in her counter offer, together with executing mutual general releases in this matter."

As stated in the letter, Martinis enclosed two cashier's checks. Martinis did not include a release form with the letter.

On December 2, 1996, the accused met with Driscoll to consider the offer. At the trial panel hearing, Driscoll testified that: the accused showed her the two cashier's checks, and she recognized them as the same checks that she had rejected previously; she expressed concern that, if she endorsed the check that had the notation "Bay poco filly * * * paid in full," then Hanna would not return the horse; and that the accused assured her that Hanna would return the horse and urged her to endorse both checks. Although the accused testified to a different version of the December 2 meeting, the trial panel expressly found Driscoll to be credible. We accept that credibility finding.

Near the end of their December 2, 1996, meeting, Driscoll endorsed the two cashier's checks and instructed the accused to give half of the total amount ($1,105) to her and to put the other half toward the attorney fees that she owed him.[1] That same day, the accused deposited the cashier's checks in his trust account and drew checks on that account, one in the amount of $1,105 payable to Driscoll and another, also in the amount of $1,105, payable to himself. The accused immediately deposited his check for $1,105 into his personal checking account.

The next day, December 3, 1996, the accused sent a letter to Martinis, purporting to accept the November 25, 1996, offer and reciting the following terms of settlement:

"1. Your client will pay the $1,610.00 breeding fees.

"2. Your client will pay $600.00 stud service, mare care, and insurance.

"3. Your client will have the horse checked by a licensed Oregon veterinarian, supply my client with a copy of the report, and will pay for the report.

"4. If the report is that the horse is in good health, your client will deliver the horse to a prearranged location in the

---

[1] As of November 27, 1996, Driscoll owed the accused $1,941.40 in attorney fees.

Eugene area. If the horse is unsatisfactory to Ms. Driscoll, your client will pay the balance of the purchase price already agreed to by the parties.

"5.   If the terms above are met, the breeding certificate will be delivered to your client, the lawsuit will be dismissed, and a letter of satisfaction will be signed by Ms. Driscoll."

The accused enclosed a stipulated dismissal for Martinis's signature, but did not enclose an executed general release, as Martinis's November 25 letter had required. On December 6, 1996, however, Driscoll signed a statement that the accused had drafted that repeated the above terms. The accused then sent the signed statement to Martinis. Driscoll testified to the trial panel that she expressly questioned the use of the term "stud service" in the statement, as that term was redundant with the term "breeding fees." The accused told Driscoll that that was not important.

When Martinis and his client received the accused's December 3, 1996, "letter of acceptance," they realized that Martinis had erred by offering the two cashier's checks *and* return of the horse, as the checks, which totaled $2,210, represented $810 more than the amount for which Hanna was willing to settle ($1,400) if she could not keep the horse. On December 6, Martinis telephoned the accused and sent him by facsimile a letter stating that he (Martinis) had made a serious mistake. Martinis asserted that the parties still had not reached a settlement, unless Driscoll was willing to accept the $2,210 in complete settlement of both contract claims. Martinis asked the accused to return the cashier's checks if Driscoll would not accept $2,210 in settlement.

The accused responded by letter dated December 6, 1996, stating that Driscoll already had accepted the terms offered in Martinis's November 25 letter, *i.e.*, $2,210 and return of the horse. The accused asserted that Hanna's failure to return the horse would be a breach of the parties' settlement agreement.

Martinis sent another letter to the accused and telephoned him several times to reiterate that the parties had not settled and that the accused had acted wrongfully by permitting Driscoll to cash the checks. In those communications,

Martinis pointed out that his November 25 offer letter and the accused's December 3 "acceptance" letter contained different terms. Specifically, in his December 3 letter, the accused had asserted that the $600 check represented the settlement for "stud service, mare care, and insurance." In the parties' previous letters, however, there was no mention of either "stud service" or "mare care." Martinis asked the accused to return the $2,210.

The accused replied that he was acting in good faith by retaining the $2,210 and insisting on return of the horse. He appeared to recognize, however, that Martinis had offered too much: "As for the offer and acceptance, there was no obligation on you to offer additional funds. You did offer additional funds with no further conditions. Ms. Driscoll accepted the offer."

On February 13, 1997, Martinis sent a letter to the Bar, recounting the accused's conduct during the settlement negotiations and asserting that the accused had violated DR 1-102(A)(3) and (4). The Bar requested a response from the accused, and, on March 12, the accused requested additional time to respond. The Driscoll matter was scheduled for arbitration on March 21, and the accused believed that the results of the arbitration might affect the issues in the Bar complaint. The Bar granted that request.

On February 25, 1997, the accused drew a check for $850 from his personal checking account and deposited it into his trust account.

The arbitrator ultimately ruled that Martinis's offer of the checks and Driscoll's subsequent cashing of the checks were an accord and satisfaction. The arbitrator dismissed all other claims between the parties and awarded Hanna, as the prevailing party, $3,748 in attorney fees.[2]

The accused's response to the Bar complaint and the subsequent Bar investigation form the bases for the second DR 1-102(A)(3) charge and for both DR 1-103(C) charges. In

---

[2] Following the arbitration, the accused withdrew from representing Driscoll. Driscoll retained another lawyer and filed a request for a trial in circuit court. The parties eventually settled the matter, with Driscoll dropping her request for return of the horse and with Hanna dropping her award of attorney fees.

his response, the accused stated that: (1) he had discussed the "ambiguity" in the November 25, 1996, letter with Driscoll and that Driscoll, not he, had made the decision to cash the checks; (2) due to the ambiguity in the November 25 letter, Driscoll left the $810 "overpayment" in the accused's trust account; and (3) Martinis never requested return of the funds, just of the actual cashier's checks.

LPRC investigators later interviewed the accused. The accused brought a copy of his trust account ledger for the Driscoll matter. The accused had redacted the ledger before bringing it to the interview; he had blackened out the descriptions of most of the various debits and credits, as well as the amounts of some transactions. The redacted ledger showed that two cashier's checks totaling $2,210 were deposited on December 2, 1996, and that a check had been issued to Driscoll in the amount of $1,105 on that date. The ledger, however, failed to show the additional December 2, 1996, check of $1,105 payable to the accused. The ledger also failed to show the $850 deposit on February 25, 1997. Relying in part on the ledger, the accused told the investigators that the $810 overpayment had remained in his trust account since December 2. Although the parties dispute certain additional statements that the accused made during his LPRC interview, the trial panel found that the LPRC investigators' testimony was more credible than the accused's testimony. As with the credibility finding respecting Driscoll, we accept the trial panel's credibility finding respecting the LPRC investigators. We therefore find that the accused also told the LPRC investigators that: (1) at the time he received the checks, he knew that there had been a mistake as to the amount of the checks; (2) he knew that, because of that mistake, negotiating the checks was dishonest; and (3) Driscoll, not he, insisted on negotiating the checks and on attempting to keep the $2,210.

The Bar later deposed the accused. During his deposition, the accused admitted that his earlier assertions that he had retained $810 in his trust account were inaccurate. He stated that he had held the $810 in his personal *savings* account. The accused also told Bar counsel that the $810 remained in his personal savings account until he deposited $850 back into his trust account on February 27, 1997.

At the trial panel hearing, the Bar introduced into evidence the accused's personal checking account and trust account records. The records showed that the accused had drawn a check on his trust account on December 2, 1996, in the amount of $1,105, payable to himself. The records showed that the accused had deposited that check into his personal *checking* account on December 2, 1996. The records also showed that, on a number of occasions between December 2, 1996, and February 25, 1997, the balance of his personal checking account fell below $810. At the hearing, the accused testified that he did not know why his trust account ledger failed to show the $1,105 check payable to him. He also testified that he never told the LPRC investigators that he knew that negotiating checks that were sent by mistake was dishonest.

As noted, the trial panel found that the accused had violated the disciplinary rules as alleged in the complaint, and it imposed a two-year suspension. On review, the Bar argues that the trial panel correctly concluded that the accused violated the disciplinary rules as alleged. The Bar argues that the appropriate sanction is at least a two-year suspension, but that the misconduct might justify disbarment. The accused argues that he committed no violations and that, even if he did, then the proper sanction is a reprimand.

We turn first to whether the accused violated DR 1-102(A)(3) by his conduct regarding Martinis's November 25, 1996, letter. DR 1-102(A)(3) provides: "It is professional misconduct for a lawyer to * * * [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]" DR 1-102(A)(3) sets out four different legal theories: dishonesty, fraud, deceit, and misrepresentation. *In re Brandt/Griffin*, 331 Or 113, 138, 10 P3d 906 (2000). The Bar proceeds on the theory that the accused acted dishonestly. This court has defined dishonesty as a " '[d]isposition to lie, cheat or defraud; untrustworthiness; lack of integrity.' " *In re Hockett*, 303 Or 150, 158, 734 P2d 877 (1987) (quoting *Black's Law Dictionary*, 421 (5th ed 1979)). This court also has suggested that the proper approach to defining the conduct that constitutes "dishonesty" is on a case-by-case basis. *See Hockett*, 303

Or at 159 (noting with approval that courts of other jurisdictions determine whether acts constitute dishonesty on case-by-case basis).

To evaluate the accused's conduct in response to Martinis's November 25, 1996, letter, we first must evaluate that letter. The first paragraph states that "[a]ll other points of your counter offer are acceptable." The "counter offer" to which Martinis was referring included payment of $1,400 and return of the horse. The second paragraph, however, states that Martinis was tendering $2,210 "in full satisfaction" of the parties' dispute and was enclosing checks totaling that amount. Those statements cannot be reconciled. Perhaps Martinis intended to agree to the terms in the accused's offer ($1,400 and return of the horse). Perhaps Martinis intended to offer $2,210 and provide for Driscoll to keep the horse. Or, Martinis might have meant to agree to return the horse and offer an extra $810 to make up for his client's refusal to pay attorney fees.[3] In short, Martinis's intentions were not clear from his November 25, 1996, letter.

■    When the accused realized that Martinis was under the mistaken impression that Martinis had tendered the amount on which the parties had agreed,[4] the accused had a duty to clarify Martinis's offer before disbursing all the proceeds from the checks. *See In re Benett*, 331 Or 270, 278, 14 P3d 66 (2000) (holding that accused lawyer violated DR 1-102(A)(3) by negotiating extra settlement checks after failing to correct opposing counsel's belief that prior settlement check had not cleared when accused knew that check had cleared); *In re Zumwalt*, 296 Or 631, 635-36, 678 P2d 1207 (1984) (holding that accused lawyer violated dishonesty rule by retaining double payment of settlement amount when second settlement check had been sent in error). The accused acted dishonestly in negotiating the checks, disbursing the proceeds, and refusing to return the overpayment when Martinis requested it. As this court previously has stated:

---

[3] Before the trial panel, the accused argued that the $810 represented Martinis's effort to compromise on the attorney fees issue. The trial panel rejected that argument. The accused does not advance such an argument in this court.

[4] The accused admitted to the LPRC investigators that he knew that Martinis had made a mistake as to the amounts of the checks.

"Conduct by which one lawyer seeks to dupe another lawyer (and the latter's client) tears at the fabric of the legal profession, which can expect to have no better reputation for trustworthiness in the community than that of its worst actors."

*In re Porter*, 320 Or 692, 707, 890 P2d 1377 (1995).

■     We also conclude that the accused acted dishonestly in sending his December 3, 1996, letter to Martinis. We agree with the trial panel's characterization of the accused's effort in that regard as a "fabricat[ion of] a new offer and settlement agreement, which included different amounts of money than what was previously discussed and which included terms such as mare care that were never discussed before." The accused's December 3, 1996, letter demonstrates that the accused negotiated the checks and disbursed their proceeds with the knowledge that the parties had not yet reached a settlement agreement. The accused violated DR 1-102(A)(3).

We turn to DR 9-101(A). That rule provides, in part:

*"All funds of clients paid to a lawyer or law firm, including advances for costs and expenses and escrow and other funds held by a lawyer or law firm for another in the course of work as lawyers, shall be deposited and maintained in one or more identifiable trust accounts in the state in which the law office is situated.* Trust accounts shall be specifically identified by use of the phrase 'Lawyer Trust Account.' No funds belonging to the lawyer or law firm shall be deposited therein except as follows:

"* * * * *

"(2)   Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is *disputed by the client* in which event the disputed portion shall not be withdrawn until the dispute is finally resolved."

(Emphasis added.) The Bar argues that the accused violated DR 9-101(A) by failing to maintain disputed funds in his trust account. Although the Bar does not specify the amount of money that forms the basis for that charge, we understand

the Bar to argue that the accused should have kept the $810 overpayment in his trust account. The Bar contends that those funds belonged to Hanna and, as such, were "other funds held by a lawyer or law firm for another."[5]

In DR 9-101(A), the phrase "other funds held by a lawyer or law firm for another in the course of work as lawyers" modifies the phrase "[a]ll funds of clients paid to a lawyer or law firm." Under general grammatical rules, because it is set off by commas, the phrase "including advances for costs and expenses and escrow and other funds held by a lawyer or law firm for another in the course of work as lawyers" is a nonrestrictive phrase. *See Chicago Manual of Style*, § 5.41, 167-68 (14th ed 1993) ("an adjectival clause or phrase that is nonrestrictive or is purely descriptive, which could be dropped without changing the reference of the noun or the meaning of the sentence, is set off by commas[.]"); William Strunk Jr., *The Elements of Style*, 3-4 (3d ed 1979) ("Nonrestrictive relative clauses are parenthetic * * *. Commas are therefore needed. A nonrestrictive clause is one that does not serve to identify or define the antecedent noun."). Because it is nonrestrictive, the phrase can be dropped without changing the meaning of the sentence. Thus, DR 9-101(A), omitting the nonrestrictive clause, reads as follows: "All funds of clients paid to a lawyer or law firm * * * shall be deposited and maintained in one or more identifiable trust accounts * * *."

■■ The above analysis demonstrates that DR 9-101(A) regulates only the lawyer's handling of funds belonging to the lawyer's client. *See also In re Howard*, 304 Or 193, 199, 743 P2d 719 (1987) (holding that former DR 9-102(A) (renumbered as 9-101(A) in 1985) is concerned with handling funds

---

[5] At the outset, we note that we cannot tell from its opinion the specific theory under which the trial panel concluded that the accused violated DR 9-101(A). Its opinion suggests that the accused should have redeposited the $1,105 that he disbursed to himself as soon as he became aware of Martinis's dispute. To the extent that the trial panel relied on DR 9-101(A)*(2)*, however, that reliance was misplaced. DR 9-101(A)(2) provides that funds belonging in part to a client and in part presently or potentially to the lawyer must remain in the trust account when the right of the lawyer to receive them is "disputed *by the client*." (Emphasis added.) Martinis, who eventually disputed that the accused and his client were entitled to the funds, was not the accused's client. Thus, DR 9-101(A)(2) is inapposite to this proceeding.

of clients, not third-party funds). Accordingly, the Bar's argument that the accused violated that rule by handling funds allegedly belonging to Martinis's client is misplaced. The accused did not violate DR 9-101(A).

■       We turn now to the Bar's allegations that the accused violated DR 1-102(A)(3) (quoted above) and DR 1-103(C) (quoted below) by lying repeatedly to the Bar and to LPRC investigators. DR 1-103(C) provides:

> "A lawyer who is the subject of a disciplinary investigation shall respond fully and truthfully to inquiries from and comply with reasonable requests of a tribunal or other authority empowered to investigate or act upon the conduct of lawyers, subject only to the exercise of any applicable right or privilege."

The accused disagrees that he intentionally lied and argues that he merely made inadvertent misstatements regarding the account in which he kept the $810. He explains that his wife, and not he, was the bookkeeper for his trust account and for their personal checking and savings accounts. He concedes the inaccuracy of the ledger that he showed to the LPRC investigators, but contends that sloppy bookkeeping, and not an attempt to mislead the Bar, is to blame.

We agree with the Bar that the record shows by clear and convincing evidence that the accused repeatedly lied to the Bar and the LPRC, thereby violating both DR 1-102(A)(3) and DR 1-103(C). First, the accused misrepresented in his letter to the Bar and during his LPRC interview that Driscoll had insisted on negotiating the cashier's checks. He also misrepresented to the LPRC investigators that Driscoll had insisted on attempting to keep the full $2,210. The accused left the investigators with the impression that he simply was carrying out his aggressive client's orders. In fact, Driscoll had questioned the settlement and endorsed the checks only after the accused had reassured her that Hanna would return the horse.

Second, the accused committed egregious misrepresentations in various statements that he made regarding his trust account. The evidence is clear that, on December 2, 1996, the accused wrote himself a check for $1,105 on his

trust account, immediately deposited that check into his personal checking account, and spent those funds. In his letter to the Bar, however, the accused stated that he had left $810 in his trust account when he negotiated the cashier's checks. In his interview with the LPRC investigators, the accused again stated that $810 had remained in his trust account. We find that the accused's alteration of his trust account ledger to eliminate the record of the $1,105 check to himself is a particularly serious misrepresentation. By the time that the Bar took his deposition, the accused knew that the Bar had obtained a copy of his trust account records from his bank, and, therefore, he changed his story to concede that he had not kept $810 in trust, but had kept that amount in his personal *savings* account. That assertion also was untrue. Furthermore, we conclude that the accused lied in his letter to the Bar when he stated that Martinis had requested that he return only the cashier's checks and not the funds.

■   We next consider the appropriate sanction. This court follows a well-established methodology in determining the appropriate sanction for violating the disciplinary rules. *See In re Gustafson*, 327 Or 636, 652-53, 968 P2d 367 (1998) (describing methodology). Consistent with that methodology, we refer to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards).

A.  *Duty Violated*

The accused violated his duty to maintain personal integrity, ABA Standard 5.1, when he acted dishonestly and engaged in misrepresentation. He violated his duties as a professional to cooperate completely and truthfully with a disciplinary investigation. ABA Standard 7.0.

B.  *Mental State*

Under the ABA Standards, an act is intentional if it is engaged in with the "conscious objective or purpose to accomplish a particular result." ABA Standards at 7. An act is knowing if it is engaged in with the "conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." *Id.* We conclude that, when the accused

negotiated and disbursed the cashier's checks, he acted with the intent to keep the funds out of Hanna's and Martinis's reach to force them into a settlement to which they had not agreed. We also conclude that the accused intentionally lied to the Bar. For example, on February 25, 1997, when the accused transferred $850 back into his trust account, he knew that a Bar complaint was pending against him. Only two months after that transfer, he stated in his letter to the Bar that the funds always had been in his trust account. The accused's shifting stories regarding the history of the $1,105 and the $810 demonstrate his willingness to lie to the Bar to cover up his prior acts and to avoid discipline.

C. *Injury Sustained*

The accused's conduct caused actual injury to Martinis and Hanna, forcing them to expend considerable time and resources in resolving the contract disputes. The accused injured his own client, Driscoll, in that the arbitrator ruled that Hanna could keep the horse and that Driscoll was liable for Hanna's attorney fees. Although the attorney fees matter eventually settled, Driscoll had to hire another lawyer to assist her. The accused's failure to respond truthfully during the disciplinary investigation caused actual harm to the disciplinary process. The accused's misstatements during the investigation distorted the LPRC investigators' perception of the truth and caused delay. The Bar discovered the account in which the accused maintained the funds in question only after obtaining his trust account records, then his personal savings account records, and, finally, his personal checking account records.

In light of the duties violated, the accused's mental state, and the injury caused by the accused's conduct, the ABA Standards suggest that disbarment or a suspension is appropriate. *See* ABA Standard 5.11(b) (suggesting disbarment when lawyer engages in intentional conduct involving dishonesty that seriously adversely reflects on lawyer's fitness to practice); ABA Standard 7.1 (suggesting disbarment when lawyer knowingly engages in conduct that violates duties owed as professional with intent to obtain benefit for lawyer or another, and causes serious or potentially serious injury to client, public, or legal system); ABA Standard 7.2

(suggesting suspension when lawyer knowingly engages in conduct that violates duties owed as professional and causes injury or potential injury to client, public, or legal system).

We turn to a consideration of aggravating and mitigating factors. The Bar seeks to establish that the accused has a prior disciplinary record, ABA Standard 9.22(a), in that he has received a letter of admonition. The Bar did not introduce evidence of any letter of admonition at the trial panel, but asks us to take judicial notice of the fact that, in September 1997, the accused received a letter of admonition for violating DR 5-105(E) (current client conflict). *See* OEC 201(b)(2) (providing that court may take judicial notice of fact that is not subject to reasonable dispute in that it is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned). To support its request for judicial notice, the Bar has attached to its brief a computer printout showing the date of the admonition (September 23, 1997) and the name of the complainant. The printout does not show the nature of the violation. We need not reach the question of whether a lawyer's receipt of a letter of admonition is a fact that is susceptible to judicial notice, because, in this case, the Bar has failed to provide us with sufficient basis for noticing the facts necessary to analyze the letter of admonition. *See In re Cohen*, 330 Or 489, 501, 8 P3d 953 (2000) (stating that letter of admonition is relevant only if conduct giving rise to letter involved same or similar type of misconduct); *In re Jones*, 326 Or 195, 200, 951 P2d 149 (1997) (stating that weight accorded prior offense as aggravating factor determined by reference to relative seriousness of prior offense and resulting sanction, number of prior offenses, relative recency of prior offense, and timing of current offense in relation to prior offense).

The Bar further argues that the accused acted with a dishonest or selfish motive, ABA Standard 9.22(b), and that he submitted false statements during the disciplinary process, ABA Standard 9.22(f).[6] We agree with the former and find that the accused acted selfishly when he misrepresented

---

[6] The Bar also argues that two other aggravating factors are present in this proceeding, but offers no analysis in that regard. We have considered the Bar's arguments and conclude that they are not well taken.

facts to the Bar and the LPRC, in that he was attempting to avoid a potential sanction.

As to ABA Standard 9.22(f), however, we take this opportunity to clarify the proper analysis for that aggravating factor. ABA Standard 9.22(f) provides that the "submission of false evidence, false statements, or other deceptive practices during the disciplinary process" is a factor that may be considered in aggravation of a sanction. We already have found that the accused's misstatements in his letter to the Bar, the LPRC interview, and the Bar deposition constituted misconduct under DR 1-102(A)(3) and DR 1-103(C). We would be "double-counting," then, if we were to conclude that that same conduct also supports application of ABA Standard 9.22(f). We now hold that the misconduct constituting a violation should not be the same conduct that justifies applying ABA Standard 9.22(f). Rather, application of that aggravating factor should be based on a different factual context than the factual context giving rise to a violation of DR 1-103(C).

Applying the foregoing principle here, we nonetheless shall apply ABA Standard 9.22(f) to this proceeding, based on the accused's misstatements during his trial panel testimony. Specifically, the accused lied when he testified that he never told the LPRC investigators that he knew that his conduct was dishonest and when he testified that he did not know why his trust account ledger failed to show the $1,105 check payable to him. That conduct occurred *after* the Bar filed its amended complaint and was not a basis for our earlier conclusion that the accused violated DR 1-102(A)(3) and DR 1-103(C). In summary, the Bar has established two aggravating factors: ABA Standards 9.22(b) and (f).

In mitigation, the parties agree, and we accept, that the accused was inexperienced in the practice of law, as he had been admitted to the Bar for approximately two years at the time of the conduct at issue in this case. ABA Standard 9.32(f).

We turn to a consideration of this court's case law. In *In re Wyllie*, 327 Or 175, 957 P2d 1222 (1998), the accused lawyer falsely represented in a report and an affidavit to the Minimum Continuing Legal Education (MCLE) Board that

he had listened to 40.5 hours of taped continuing legal education materials in a two-month period. *Id.* at 177, 180. In an ensuing audit, the accused lawyer made false statements to a MCLE administrator. The MCLE Board then filed a complaint with the Bar. The accused lawyer made additional false statements to the Bar concerning his MCLE report. *Id.* at 178-79, 180. This court found that the accused lawyer in *Wyllie* violated DR 1-102(A)(3) and DR 1-103(C). As in this proceeding, the court also found that the accused lawyer acted intentionally. *Id.* at 182. The court found several aggravating factors—a dishonest or selfish motive; deceptive practices during the disciplinary process; refusal to acknowledge the wrongful nature of the conduct; and substantial experience in the practice of law—and no mitigating factors. This court imposed a two-year suspension.

As noted earlier, the accused lawyer in *Zumwalt* was dishonest in retaining double payment of settlement. This court imposed a public reprimand as a sanction in *Zumwalt*. 296 Or at 637. Also as noted earlier, this court concluded that the accused lawyer in *Benett* had violated DR 1-102(A)(3) by failing to correct his earlier representation and negotiating extra settlement checks sent by opposing counsel. 331 Or at 278. This court imposed a 180-day suspension in that case, but the accused lawyer also had violated other disciplinary rules in a second matter. The sanction analysis in *Benett* indicates that those other violations played a greater role in deciding the length of the sanction.

We conclude that, in light of *Wyllie*, *Zumwalt*, and *Benett*, a two-year suspension is appropriate as a sanction for the accused's numerous misrepresentations to the Bar and for his dishonesty in settlement negotiations.

The accused is suspended from the practice of law for two years, commencing 60 days from the date of filing of this decision.