179 P.3d 1021 (2006)
The PEOPLE of the State of Colorado, Complainant
v.
Susan G. HAINES, Respondent.
No. 04PDJ112.
Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.
April 21, 2006.

*1022 OPINION AND ORDER IMPOSING SANCTIONS
On January 17-20 and 24-25, 2006, a Hearing Board comprised of Marilyn L. Robertson, John E. Hayes, both members of the Bar, and William R. Lucero, the Presiding Disciplinary Judge, held a hearing pursuant to C.R.C.P. 251.18. Kim E. Ikeler appeared on behalf of the Office of Attorney Regulation Counsel ("the People"). Susan G. Haines ("Respondent") appeared and was represented by Eric B. Liebman and Lee Katherine Goldstein. The Hearing Board issues the following Opinion and Order Imposing Sanctions based upon the presentation of the parties.
SANCTION IMPOSED: ATTORNEY DISBARRED

I. ISSUE

Disbarment is appropriate when a lawyer acts deceitfully and thereby misappropriates funds. Pursuant to a contingency fee agreement, Respondent knew she earned approximately 5% of contingency fees from litigation on behalf of an estate. Unbeknownst to litigation co-counsel and her client, the personal representative of the estate, Respondent took more than 100% of these contingency fees. Is Respondent's conduct deceitful even if she could claim administrative fees for estate work earned on an hourly basis?

II. PROCEDURAL HISTORY AND BACKGROUND

On December 10, 2004, the People filed a complaint in case 04PDJ112. Respondent filed an answer on January 24, 2005. On January 17, 2006, the Hearing Board began hearing evidence on the substantive allegations set forth in the People's complaint. The Hearing Board also heard evidence of aggravating and mitigating factors. The People argued Respondent's conduct warrants disbarment while Respondent argued for the dismissal of all claims, or in the alternative, a sanction short of disbarment. The People presented four witnesses that included an expert in probate law. Respondent presented three witnesses, three expert witnesses, and her own testimony as an expert in probate and elder law.

III. FINDINGS OF FACT

The Hearing Board considered the testimony of witnesses and exhibits admitted into evidence, and makes the following findings of material fact by clear and convincing evidence.
Respondent took and subscribed the Oath of Admission and gained admission to the Bar of the Colorado Supreme Court on October 30, 1984. She has been registered upon the official records of the Colorado Supreme Court, Attorney Registration No. 14114, and is therefore subject to the jurisdiction of this court pursuant to C.R.C.P. 251.1(b).
The Edouart Estate
Respondent represented John Erpelding ("Erpelding"), personal representative of the Dorothy Edouart Estate ("Edouart" and "the Estate"). Erpelding agreed to act as the personal representative of the Estate at the behest of Respondent after the previous personal representative's health failed. Erpelding practiced probate law in California for nearly fifty years, and agreed to serve as the personal representative after Respondent assured him that her firm would perform all administrative work. Respondent notified Erpelding by letter that her fees for the administrative work would be calculated on an hourly basis, but that any litigation the Estate might undertake would be governed "separately" by a contingency fee agreement with litigation counsel.[1]
*1024 As fiduciaries of the Estate, Respondent and Erpelding were responsible for identifying and marshaling its assets including any potential litigation claims.[2] In this context, Respondent and her firm reviewed documents from the Estate and discovered possible fraud and undue influence claims against Howard Zwick ("Zwick"), Edouart's son, and the lawyer who helped him obtain property from Edouart. Respondent also identified potential malpractice claims against lawyers who represented Edouart in Florida in the estate matters in question.
Though Respondent identified the potential claims, she also recognized these claims presented complex legal and factual issues in multiple jurisdictions that would require representation from an experienced trial attorney on behalf of the Estate. In 2001, Respondent hired Michael T. Mihm ("Mihm"), an experienced trial attorney who was then a partner with the law firm of Kennedy and Christopher, P.C. ("K & C"). Thereafter, Mihm acted as lead litigation counsel for the Estate and promptly initiated discovery, hired experts, and hired local counsel to advance the Estate's claims. Due to the costly nature of pretrial litigation, and the Estate's lack of funds, Mihm and K & C agreed to advance the costs of litigation and obtain payment from the Estate at a later date.
Before Mihm began work on the Edouart litigation, Respondent's firm, Mihm, and Betty Litzko (personal representative at that time) entered into a written contingency fee agreement[3] that summarized the rights and duties of the parties and limited the scope of representation to the litigation Mihm undertook against Zwick and others on behalf of the Estate. One of the major provisions of the contingency fee agreement outlined the disbursal of any funds that might be realized from the claims Mihm would soon litigate on behalf of the Estate. The agreement provided that 33 1/3% of the gross recovery would be shared between Respondent's law firm and K & C based upon the work performed.[4] When a case settled, the parties would arrange an accounting to determine the amount owed to each firm. In the event of a dispute as to the division of the fees and costs, the firms agreed to resolve it through binding arbitration.
In addition to sharing fees based on work performed, the contingency fee agreement also allowed the firms to recoup costs of litigation from any recovery. After disbursal of fees and costs to the lawyers, the Estate would be entitled to the remainder. The parties also maintained an attorney's lien on fees for work they performed. Neither Respondent nor Mihm had a right to collect fees calculated on an hourly basis from any settlement based on hourly work they performed in the litigation.
In August 2001, with Erpelding's approval, Mihm filed a suit on behalf of the Estate in the United States District Court for the Southern District of Florida ("Florida District Court") and hired local counsel to assist in the litigation. After they evaluated the malpractice claims against various defendants in the Florida litigation, both Respondent and Mihm initially estimated a potential judgment of up to $1.5 million in favor of the Estate.[5] The Florida litigation, however, proved to be more difficult than the parties anticipated.
On the eve of trial, in early December 2002, the trial judge ruled that the Florida District Court did not have jurisdiction over some of the defendants and hinted that summary judgment might be granted in favor of the Zwicks, the most culpable party to the lawsuit according to Mihm, Respondent, and Erpelding. With the trial court judge signaling he would likely dismiss the claims against all but one defendant, a Florida attorney, Mihm and Erpelding accepted an offer of *1025 $200,000 to settle all claims against this attorney.
Before they accepted the offer, Mihm and Erpelding contacted Respondent by phone from Florida and advised her of the proposed settlement. Respondent was upset that Mihm agreed to settle for substantially less than she felt the case was worth, but did not voice any objection at the time. After they agreed to the settlement, Mihm and Erpelding decided that the Estate should use the $200,000 to pay the costs Mihm expended in the Florida litigation and set aside the remainder as a "war chest" to help pay for future litigation costs the Estate would incur when they appealed the Florida District Court's rulings and initiated a new action against Zwick in Rhode Island. Mihm later proposed this idea to Respondent in a face-to-face meeting with her when he returned to Denver from Florida.
This face-to-face meeting occurred on December 19, 2002. Mihm, Respondent and others met for more than four hours at K & C's office to discuss future strategy on the claims dismissed by the Florida District Court, as well as disbursement of the $200,000 in settlement funds.[6] During the meeting, Mihm reiterated that his firm would no longer advance the costs of litigation and insisted that his firm be paid immediately for costs it expended in obtaining the $200,000 settlement. He also stated that if the Estate wanted to continue the litigation, it would need to hire appellate counsel in Florida to appeal the adverse rulings of the Florida District Court.[7] Furthermore, Mihm suggested that if the Estate intended to pursue Zwick and his Rhode Island attorney, they would need to hire a "high profile" lawyer in Rhode Island. At that time, the Estate still owed $17,000 to local counsel in Florida who assisted Mihm in litigating the Florida claims.
Without additional funds to pay costs of future litigation, the parties faced the prospect of receiving only a fraction of the fees they had each generated in representing the Estate. Mihm's firm alone had logged approximately $500,000 in fees directly related to the Florida litigation. Respondent testified that her firm logged, but never collected, nearly $100,000 for administrative work done on behalf of the Estate. All of this administrative work was completed before Respondent hired Mihm. Though Respondent's firm had billed approximately $100,000 in fees to the Estate, those fees were billed on an hourly rate for administrative matters unrelated to the litigation. By Respondent's own estimate in these proceedings, Mihm's firm completed about 95% of the litigation work while her firm completed about 5%.
With no prospect of the Estate funding future litigation, Mihm proposed during the December 19th meeting that his firm temporarily forgo their share of the settlement funds (approximately $63,000) under the contingency fee agreement. Mihm further proposed his earned fees be used to fund a "war chest" for future litigation as he and Erpelding had earlier agreed. During these discussions, Respondent literally calculated and contemplated, but never articulated, that she intended to take $70,000 for her firm leaving $84,000 for Mihm's costs and $25,000 for future litigation.[8]
Following the meeting, Mihm drafted and sent a letter to Respondent memorializing his understanding of the disbursal of contingency fees and costs discussed at the meeting of December 19, 2002.[9] Respondent received this letter in the mail but never responded to Mihm's proposal.[10] Neither during nor following the meeting on December 19, 2002, *1026 did the parties reach an agreement about the disbursal of funds from the settlement that modified their written contingency agreement. Under this agreement, Respondent was due approximately $4,000, based on her own estimate that her firm completed about 5% of the work in the litigation matter.[11] Mihm should have received $173,000, (approximately $63,000 in fees and $110,000 for costs)[12] and the Estate would have netted roughly $23,000. After paying Florida counsel $17,000, the Estate would have had little money to appeal the adverse decisions they suffered in Florida or to pursue claims in Rhode Island against Zwick.
Shortly after the December 19, 2002 meeting, Mihm received a call from Zwick's counsel in the Florida litigation. Zwick's counsel notified Mihm that he planned to file a motion in the Arapahoe County Probate Court to request an order that would restrain the disbursal of the settlement proceeds until the Zwicks had an opportunity to challenge any disbursement. Mihm recalled that he notified Respondent of this motion but cannot document his notice to her in writing.
On or about December 23, 2002, four days after Mihm and Respondent met to discuss case strategy and disbursement of settlement funds, John Campbell ("Campbell"), an associate with Respondent's law firm, called Erpelding at Respondent's direction and asked if their firm could be paid their fees. However, Campbell did not inform Erpelding that Respondent planned to take $70,000 and/or that the fees were for estate administration work completed on an hourly basis as opposed to fees Respondent's firm earned subject to the contingency fee agreement. Furthermore, neither Respondent nor Campbell explained to Erpelding what legal exposure the Estate might incur if Respondent took more proceeds from the Florida settlement than she was authorized to take under the written contingency fee agreement.
Erpelding told Campbell to "do whatever was necessary" to pay Mihm and Respondent's firm for the work they had performed on behalf of the Estate. Respondent controlled the Estate's account as the only authorized signatory throughout her representation of the personal representative. Erpelding did not keep track of the balance of the Estate's account and trusted Respondent to charge no more for fees than reasonable given the limited amount of money the Estate maintained.
Though Respondent never specifically accepted or rejected Mihm's written or oral proposals to set aside all of the contingency fees Mihm earned for a "war chest," Mihm took Respondent's silence as approval of his proposal. He therefore endorsed the settlement check and turned it over to Respondent on December 31, 2002 with the understanding that his firm would be paid all its costs and that the remainder would be used as a "war chest" for future litigation.
As soon as Mihm turned over the settlement check to Respondent, she deposited it into the Estate's account.[13] She then immediately wrote two checks[14] totaling $70,000 to her firm, one for $33,000 with the notation "contingency fees" and the other for $37,000 with the notation "estate work" in the Edouart case. The bank negotiated the checks Respondent wrote to her law firm the same day she wrote them. At the time, her firm's account had a balance of $7,250.09. After depositing $70,000 into her firm's account, Respondent caused her bookkeeper to write checks to pay for miscellaneous law office expenses and herself.
In addition to writing herself checks from the proceeds of the settlement, Respondent also tendered an $84,000 check to Mihm's firm for litigation costs and a separate check for $25,000 to hire counsel in Rhode Island. Mihm did not understand why he received a $25,000 check because he never discussed this amount with Respondent. Mihm did not *1027 cash the checks from Respondent because he knew that counsel for Zwick would soon file a motion to restrain the disbursement of any settlement funds and the probate court might grant this motion. Shortly thereafter, the probate court did grant Zwick's motion to restrain disbursal of the settlement funds. At about this time, the Florida District Court awarded Zwick attorney fees for defending the Florida litigation against the Estate in the amount of $170,000.
Respondent testified unequivocally in these proceedings that Mihm specifically agreed at the meeting of December 19, 2002, that she could take out fees and costs of $70,000 from the settlement check. Respondent also testified that she called Erpelding and that he too agreed that she could take $70,000 from the settlement fees. Yet, when first asked to respond to Mihm's complaint filed with the Office of Attorney Regulation, Respondent stated that she acted mistakenly and naively in believing Mihm had agreed she could take $70,000.[15] There is no credible evidence that Respondent ever told Mihm or Erpelding that she intended to claim $70,000 once they turned over the settlement check to her for deposit into the Estate's account.[16]
Mihm and Erpelding did not discover that Respondent had taken $70,000 from the settlement until sometime in May 2003.[17] At the time Mihm confronted Campbell about taking $70,000 from the Estate account, Campbell made no mention that Mihm and Erpelding had agreed to such a disbursement. Instead, he offered that Respondent's firm had a billing problem. When Mihm and Erpelding were fully advised of the Respondent's withdrawal of $70,000 from the settlement proceeds, they both asked Respondent to return the money. Although Respondent offered to negotiate the matter, she did not return the money and told Erpelding that her firm could not return the money without causing financial harm to the firm. She later filed bankruptcy, but failed to provide Mihm and Erpelding with notice of the bankruptcy, prompting them to file an adversary pleading urging the bankruptcy court not to discharge her obligation to Mihm and the Estate in the amount of $70,000.
As a result of the ancillary litigation and the conflict caused by Respondent's actions, Mihm hired separate counsel for Erpelding and engaged in additional litigation in the probate court as well as the bankruptcy court. In June 2003, after Respondent failed to return the funds or make arrangement to return them, Mihm filed a complaint with the People.[18]
The Rose Matter
On May 15, 2002, Respondent and Sheli Rose entered into an agreement for Respondent to provide a Medicaid Estate plan for Mrs. Rose. At the time, Mrs. Rose and her husband were still legally married but had not lived together for over 13 years. After separating from Mrs. Rose, Mr. Rose signed his ownership interest in the family residence to Mrs. Rose making her the sole owner.
In 2002, Mr. Rose's health worsened and it was clear that he would soon need nursing home care. With this circumstance, Mrs. Rose needed advice on how Mr. Rose's application *1028 for Medicare would affect her assets, in particular the house she and Mr. Rose previously owned together. Mrs. Rose sought Respondent's counsel as an expert on this issue. Indeed, Respondent had authored several articles, had given several lectures on Medicaid eligibility, and had been considered an expert in this field.
On May 24, 2002, Respondent sent a twenty-page letter to Mrs. Rose entitled "Medicaid for Gabe Rose." John Campbell signed the letter on Respondent's behalf. The letter opined that it would be difficult to have Mrs. Rose's marital home declared exempt under Medicaid regulations and that these regulations may require Mrs. Rose to sell her house or obtain a divorce from her husband. Campbell later sought a "predetermination" of whether Mrs. Rose's residence would be exempt for purposes of determining Mr. Rose's eligibility for Medicaid. Campbell sent this letter to Marianne Towey, the lawyer who oversaw Medicaid for the Colorado Department of Health Care Policy and Financing. Ms. Towey's response stated, "[t]he home owned and occupied by the community spouse is exempt."[19]
The People's expert testified that as a matter of practice most lawyers would realize that Mrs. Rose's house would qualify as an exempt asset under Medicaid regulations (as written at the time of representation) without the necessity of Mrs. Rose taking further steps to qualify. Thus, this expert stated that Respondent failed to competently represent Mrs. Rose. Two other experts disagreed and stated that the declaratory opinion provided assurance to the client and cleared up what might have been a misinterpretation by county authorities that could have misconstrued the regulation.

IV. CONCLUSIONS OF LAW  SUBSTANTIVE ALLEGATIONS

The Edouart Matter
The Hearing Board finds by clear and convincing evidence that:
1. Respondent violated Colo. RPC 1.4(b) when she failed to fully explain to Erpelding the effect on the Estate of her withdrawal of $70,000 in administration fees from the Estate's account, which monies were subject to the contingent fee agreement. This conduct precluded Erpelding from making an informed decision on the best interests of the Estate.
2. Respondent violated Colo. RPC 1.15(a) and (c) when she failed to keep property belonging to Mihm, his fees and costs, separate from her operating account, until the completion of an accounting and severance of the amounts due to Mihm, the Estate, and Respondent.
3. Respondent violated Colo. RPC 8.4(c) by engaging in conduct involving deceit and by misappropriating funds belonging to the Estate and Mihm. Respondent had a right to no more than 5% of the $66,666 in attorney fees from the $200,000 settlement. Without giving Mihm or her client an opportunity to exercise their respective rights under the contingency agreement, Respondent unilaterally took substantially more than the amount due to her firm under the contingency fee agreement. Respondent acted deceitfully when she took funds without notice and without consent from Mihm and Erpelding. Without such consent, the settlement proceeds should have been shared as set forth in the written fee agreement.
4. Respondent violated Colo. RPC 1.15(a) and (f)(1) when she failed to hold property of a client separate from her own property. The contingency fee agreement provided Respondent a right to fees earned in the litigation, but by taking money from the Estate for fees earned outside of the contingency agreement, the Respondent failed to preserve the Estate's portion of the settlement.
The Rose Matter
Due to a lack of clear and convincing evidence, the Hearing Board finds Respondent did not violate Colo. RPC 1.1. For *1029 the most part, her associate John Campbell represented Mrs. Rose. He wrote the letter to Mrs. Towey seeking a predetermination of Mrs. Rose's Medicaid issue. Even if Respondent had written the letter, the Hearing Board cannot find that writing such a letter demonstrated incompetence. Respondent firm did not even charge Mrs. Rose for drafting the letter asking for a predetermination. Perhaps most lawyers practicing Medicaid law in Colorado would think that writing such a letter was unnecessary. While such conduct may show an abundance of caution, it completely fails to demonstrate incompetence. Likewise, Respondent's advice that the fact that Mr. Rose had not lived with Mrs. Rose might raise an issue under the regulation was a matter that the experts disagreed on, but was not sufficient to show a lack of competence.

V. SANCTIONS

The American Bar Association Standards for Imposing Lawyer Sanctions (1991 & Supp.1992) ("ABA Standards") and Colorado Supreme Court case law are the guiding authorities for selecting and imposing sanctions for lawyer misconduct. The appropriate sanction depends upon the facts and circumstances of each case.

Analysis Under the ABA Standards

Disbarment is generally appropriate when a lawyer converts client property or intentionally acts with deceit and lack of candor. ABA Standards 4.11, 4.61 and 5.11(b), respectively. Therefore, disbarment is the presumptive sanction for Respondent's misconduct. However, before imposing a sanction after a finding of lawyer misconduct, ABA Standard 3.0 directs the Hearing Board to first consider the following factors to determine whether the presumed sanction is appropriate:
(1) the duty violated;
(2) the lawyer's mental state;
(3) the actual or potential injury caused by the misconduct; and
(4) the existence of aggravating or mitigating factors.
A. THE DUTY VIOLATED
Respondent violated duties to her client, litigation co-counsel, and the legal profession when she failed to fully disclose her intent to take $70,000 from the settlement proceeds, and then took the $70,000 without the consent of her client and litigation co-counsel. Although Erpelding reluctantly admitted that he should have been more vigilant, Respondent had the primary duty as the personal representative's lawyer to see that Erpelding carried out his fiduciary duties to the Estate. Respondent also had a duty to deal fairly and candidly with her litigation co-counsel. In taking the money, Respondent placed her financial interests above these duties.
B. THE LAWYER'S MENTAL STATE
Respondent acted knowingly and intentionally. She knew that her firm was subject to the written contingency fee agreement and even re-read it shortly before she took the funds. She was also aware that her firm's share of the settlement fees pursuant to this agreement was approximately $4,000 yet she still withdrew $70,000 from the settlement proceeds. While Erpelding authorized Respondent "to do whatever was necessary" to pay Mihm and her firm fees and costs, Respondent knew that her client was nevertheless still bound by the terms of the fee agreement to pay Mihm his fees based upon the work he and his firm completed on behalf of the Estate. "Conduct by which one lawyer seeks to dupe another lawyer (and the latter's client) tears at the fabric of the legal profession, which can expect to have no better reputation for trustworthiness in the community than that of its worst actors." In re Complaint as to the Conduct of Daniel Q. Gallagher, 332 Or. 173, 182, 26 P.3d 131 (Or.2001).
While Respondent initially claimed that she acted on a mistaken belief that she had permission to take $70,000 from the settlement funds, the record does not support her assertion. Respondent's actions instead reveal a conscious objective to pay her firm $70,000 from the settlement proceeds, without the consent of her client and *1030 litigation co-counsel and not to disclose the same, in spite of the terms of the contingency fee agreement.[20]
C. THE ACTUAL OR POTENTIAL INJURY
Respondent caused injury to the Estate when she charged an hourly rate after her firm agreed to charge a contingency fee limited by the terms of a written fee agreement. Her conduct also halted the pursuit of further litigation Mihm would have shouldered on behalf of the Estate and left the Estate with substantial bills and no apparent way to pay them. In this process of litigating the rights and duties of the parties following Respondent's misappropriation, Mihm had to find counsel to represent Erpelding independent of K & C because of the conflicts that arose.[21]
D. AGGRAVATING AND MITIGATING FACTORS
1. MATTERS IN AGGRAVATION, ABA STANDARD 9.2
The Hearing Board considered evidence of the following aggravating circumstances in deciding the appropriate sanction to impose.
Dishonest or Selfish Motive  9.22(b)
Respondent was primarily interested in obtaining payment for services her firm performed outside the written contingency agreement. While she had a right to be paid reasonable fees, Respondent placed her financial interests first, and disregarded those of her litigation co-counsel and her client. Even if Respondent believed she could take the funds without harming the Estate, she had no right to the money derived from the Florida litigation settlement in the first instance.
Submission of False Evidence or Statements  9.22(f)
Respondent testified that she specifically advised Mihm at the December 19, 2002 meeting of her intention to take $70,000 from the settlement proceeds and that he consented. She also specifically testified that Erpelding gave her permission to take $70,000. Based upon all the testimony and the facts and circumstances surrounding that meeting, the Hearing Board finds Respondent falsely testified on this point.
Refusal to Acknowledge Wrongful Nature of Conduct  9.22(g)
In these proceedings, Respondent steadfastly refused to acknowledge that she acted deceitfully. Instead of accepting responsibility for her actions, she blamed her client for not reviewing billing statements[22] and Mihm for leading her to believe that the disbursement of $70,000 would be acceptable with him. Finally, Respondent offered testimony from experts that once the settlement proceeds were placed into the Estate account, she was authorized to make withdrawals as long as Erpelding agreed. However, the Hearing Board finds that Erpelding did not make an informed decision about payment of fees to Respondent because Respondent failed to provide Erpelding with sufficient information about her plan to withdraw funds well beyond what she could legitimately claim.
Vulnerability of the Victim  9.22(h)
Respondent's client, the personal representative, was a particularly vulnerable client because he was elderly, lived in California, did not control the Estate's account, and placed complete trust in Respondent to help him carry out the fiduciary duties he owed to the Estate. Respondent also *1031 failed to timely provide Erpelding with the Estate's account statements. Erpelding agreed to work for free after Respondent assured him that he would not have to do any of the administrative work. Under this arrangement, Erpelding relied heavily on Respondent and trusted her to properly advise him and act in the best interest of the Estate.
Substantial Experience in the Practice of Law  9.22(i)
Respondent practiced law for nearly 22 years and has established herself as a recognized expert in the field of elder law.
Indifference to Making Restitution  9.22(j)
Respondent did not make a good faith effort to replace the money she took, even after the personal representative and Mihm asked her to do so. Further, Respondent presented testimony that showed she nevertheless met her other financial obligations at or about the time that Mihm and Erpelding asked her to return the money she took.
2. MATTERS IN MITIGATION, ABA STANDARD 9.3
Absence of a Prior Disciplinary Record  9.32(a)
Respondent practiced nearly 22 years without a prior disciplinary record.
Personal or Emotional Problems  9.32(c)
At or about the time Respondent took $70,000 from the Estate's account, she suffered from a lupus-like infirmity and other health problems, and as a result needed to take pain medication. While Respondent suffered from significant pain and engaged herself in a pain management program, her condition did not cause the conduct in this case. Even so the Hearing Board considered her condition in reaching its conclusions.
Delay in the Disciplinary Proceedings  9.32(i)
Although Respondent asked for a number of continuances in these proceedings, not all of them are attributable to circumstances within her control. Erpelding died during the course of these delays and could not testify at trial. During his deposition, which was videotaped and was viewed by the Hearing Board, Erpelding testified numerous times about the fine work Respondent completed on behalf of the Estate and his desire that neither she nor Mihm be harmed in these proceedings. Erpelding also stated during his deposition that he believed Respondent made a mistake in taking the funds in question.
Good Character or Reputation  9.32(g)
Respondent practiced for nearly 22 years and has earned a reputation amongst some of her peers as a brilliant probate lawyer who has served the bar and the public well.[23]
Analysis Under Case Law and ABA Standards
Colorado Supreme Court case law applying ABA Standards 4.11, 4.61, and 5.11(b) hold that disbarment is the presumptive sanction when a lawyer misappropriates client or third party funds or deceives a client with the intent to benefit the lawyer and thereby causes potential injury.
"When there is a dispute as to what share a lawyer is to receive from trust funds being held by the lawyer, whether the dispute is with a client or a third party, the lawyer must not take advantage of his physical control of the funds . . . [I]nstead, he must disburse the undisputed share, as required by Rule 1.15(b), and keep safely segregated the remainder under Rule 1.15(c) until the dispute is resolved." The Law of Lawyering, § 19.7 (3rd Ed.2002 Supp.).
Respondent cannot credibly claim that the $70,000 she took amounted to her undisputed share of the Florida litigation settlement proceeds or that the parties agreed she could take that amount. Although *1032 Respondent claims that there was no dispute in this case, she ignores the fact that a specific contingent fee agreement outlined that the fees would be split based upon work performed on the litigation, not an hourly basis for administrative work. Finally, the only rational explanation as to why neither Mihm nor Erpelding failed to voice an objection to Respondent's taking $70,000 is that they were completely unaware of it. Had Respondent disclosed her intent to do so at the December 19, 2002 meeting, Mihm surely would have objected as he and Erpelding did some five months later when they discovered Respondent's misappropriation.
Knowing misappropriation [for which the lawyer is almost invariably disbarred] "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." In re Noonan, 102 N.J. 157, 160, 506 A.2d 722 (1986). Misappropriation includes "not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." In re Wilson, 81 N.J. 451, 455 n. 1, 409 A.2d 1153 (1979). People v. Varallo, 913 P.2d 1, 11 (Colo.1996); Cf. People v. Fisher, 89 P.3d 821 (Colo.2004). Respondent's intent is decisive in cases involving alleged conversion and deceit. The People must prove by clear and convincing evidence that Respondent's misappropriation was knowing and not just negligent. See People v. Rader, 822 P.2d 950, 953 (Colo.1992).
The Hearing Board carefully considered Respondent's testimony that Mihm and Erpelding specifically approved her taking $70,000 and finds this testimony to be false. The facts and circumstances show by clear and convincing evidence that neither Mihm nor Erpelding would have approved Respondent taking $70,000. First, Mihm's law firm had expended over $100,000 in costs and logged fees of approximately $500,000 in this litigation and was motivated to be paid as promptly as possible. Second, Respondent admits that Mihm's firm had done most of the work on the litigation and would have had a right to claim almost all of the 1/3 contingency fees on the settlement, approximately $63,000. Third, and most important, Mihm and Erpelding had already decided to use Mihm's fees to fund a war chest for the costs of future litigation, subject to Respondent's approval.
Reason and common sense show that the only way Mihm could ever hope to be paid the nearly $500,000 his firm had billed was to successfully prosecute those defendants who were dismissed in Florida for lack of jurisdiction. It would be contrary to Mihm's financial interests as well as that of the Estate to give up his right to his fees earned under the settlement so Respondent could claim $70,000 for fees she claimed she earned on an hourly basis for administering the Estate, a matter wholly outside the written contingency fee agreement.

VI. CONCLUSION

One of the primary goals of our disciplinary system is to protect the public from lawyers who may pose a danger to them. While this is Respondent's first and only case involving a breach of the Colorado Rules of Professional Conduct, Respondent's misconduct demonstrates a serious lack of integrity and candor. Furthermore, the aggravating factors substantially outweigh the mitigating factors.
Respondent should have acted as a representative of the personal representative, a fiduciary, when she dealt with money belonging to the Estate and her litigation co-counsel. She held a position of trust. See People v. Nulan, 820 P.2d 1117, 1119 (Colo.1991). Instead, at the December 19th meeting she contemplated taking $70,000 even while Mihm explained his proposition to use his fees as a war chest. Thereafter, she took advantage of her control over the Estate's account and Erpelding's willingness to trust that she would act in a reasonable manner.
Lawyers in Colorado must be guided by the highest moral and ethical standards. Regardless of Respondent's financial needs, purposeful deception will not be tolerated, especially where the deceit is used to gain a financial advantage over others who have placed a high degree of trust in her to handle funds honestly. See In re Pautler, 47 P.3d *1033 1175, (Colo.2002). Respondent ignores the lawyer's moral and ethical duties and urges the Hearing Board to find that once Mihm agreed to place the funds into the Estate's account, he no longer had standing to object to her taking $70,000. The Hearing Board rejects this interpretation of substantive law as applied to rules of professional conduct.
While a lawyer's good faith actions based upon a well-established rule of law may provide a defense to an ethical violation, this is not one of those situations. To accept that a legal loophole excused Respondent's conduct, the Hearing Board would have to ignore a lawyer's duty to deal with others, including co-counsel, honestly, fairly, and with candor. The Hearing Board invited the Respondent to provide case law to support her legal argument; however, she failed to provide such case law. Furthermore, the Hearing Board cannot find that her conduct was acceptable based upon custom and practice in probate law. See Matter of Sather, 3 P.3d 403, 406 (Colo.2000).
Finally, the Hearing Board finds Respondent's persistent claim that she had permission to take $70,000, or in the alternative, that substantive probate law immunized her from any sanction, demonstrated a continuing and troubling lack of candor and acceptance of responsibility.

VII. ORDER

The Hearing Board therefore ORDERS:
1. SUSAN G. HAINES is hereby DISBARRED from the practice of law, effective thirty-one (31) days from the date of this order.
2. SUSAN G. HAINES SHALL pay the costs of these proceedings. The People shall submit a Statement of Costs within fifteen (15) days from the date of this Order. Respondent shall have ten (10) days thereafter to submit a response.
3. SUSAN G. HAINES SHALL pay restitution in the amount of $70,000 to the Estate of Dorothy Edouart.
NOTES
[1] See Respondent's Trial Exhibit J.
[2] At the time Respondent filed the probate action in Arapahoe District Court, the Estate had approximately $12,000 in its bank account.
[3] See People's Exhibit 37.
[4] Respondent initially proposed a 50-50 split of any fees Mihm earned in the litigation.
[5] The attorneys evaluated the value of these claims as low as $600,000 and as high as $1.6 million during the course of litigation brought on behalf of the Estate.
[6] Erpelding did not appear at this meeting.
[7] Mihm contacted an appellate lawyer who quoted a fee of $70,000 to complete the entire appeal, or $35,000 if Mihm's firm assisted with it.
[8] See Exhibit U. Although Respondent testified that she actually told Mihm she would be taking $70,000 and offered this exhibit in support of her contention, the Hearing Board specifically finds that she contemplated taking this money but did not disclose the same to Mihm.
[9] See People's Trial Exhibit 70.
[10] The Hearing Board does not find Respondent's claimed failure to read this letter before she took $70,000 affects its decision, because the letter substantially memorialized the proposal voiced in the meeting of December 19, 2002.
[11] This figure is consistent with Respondent's billing records Exhibit ZZZ.
[12] Mihm's costs ultimately exceeded $140,000.
[13] The settlement check was payable to Mihm and Erpelding. Erpelding did not endorse the check but gave Respondent permission to deposit it into the Estate's account. Before the deposit of the settlement check, the Estate's account contained $806.77.
[14] See Stipulated Exhibit 76.
[15] See Exhibit 135 page 17. "At the same time, I naively believed that when the settlement was being be (sic) paid over to the Estate because Mr. Mihm had deferred his fees there were no restrictions on disbursing the funds. I was never, ever told by anyone until May of 2003 that there was any agreement for all of those monies to be paid to Kennedy & Christopher. I can now understand why Mr. Mihm was so angry. He believed I had violated an agreement and I had no knowledge of this agreement."
[16] The Hearing Board agrees that Mihm would have objected had Respondent told him that she intended to withdraw $70,000 from the settlement proceeds.
[17] On April 27, 2003, an associate from Respondent's firm called Mihm and advised him that the balance in the Estate account was $126,237.99, insufficient funds needed to pay the costs claimed by K & C. Mihm promptly advised Erpelding. Mihm and Erpelding had no knowledge that a substantial portion of the settlement funds was missing prior to this date. Finally in May 2003, Campbell admitted that Respondent had withdrawn $70,000 from the settlement proceeds after depositing them into the Estate account.
[18] Erpelding did not file a complaint and maintained, until his death that it was not for him to decide whether Respondent violated the Rules of Professional Conduct.
[19] See the People's Trial Exhibit 52.
[20] Exhibit UU shows Respondent contemplated taking $70,000 from the settlement proceeds while attending the December 19, 2002 meeting with Mihm.
[21] At the time of the hearing, the evidence suggested that Mihm still had not received his fees under the contingency fee agreement from the Edouart settlement.
[22] Respondent's testimony concerning Erpelding's state of mind varied. At times she referred to him as "brilliant lawyer" but after Erpedling asked her to return the money, she referred to him as an older man "slipping due to dementia."
[23] See Respondent's resume tendered in lieu of detailed testimony.